STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

COASTAL RESOURCES MANAGEMENT COUNCIL
Oliver H. Stedman Government Center
4808 Tower Hill Road, Suite 3
Wakefield, R.I. 02879-1900

(401) 783-3370
FAX: (401) 783-3767

Date: July 5, 2006

File Number: 2003-05-155

To Whom It May Concern:

Attention is invited to the provisions of Section 42-35-15 of the Administrative Procedures Act whereby a final decision in a contested case may be subject to judicial review provided a complaint is filed in the Superior Court of Providence County within thirty (30) days after the mailing of the decision. This thirty (30) day period for the Champlin's Realty Associates consolidated with the Town of New Shoreham Harbor Management Plan application case expires on August 4, 2006.

Sincerely,

Brian A. Goldman, Esq.
Legal Counsel for Coastal Resources
Management Council

BAG:ann

RECEIVED
JUL 07 2006
COASTAL RESOURCES MANAGEMENT COUNCIL

STATE OF RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL
PROVIDENCE, SC.

Oliver H. Stedman Government Center
Tower Hill Road, Wakefield, RI 02879

# Decision

Petition Of: Champlin's Realty Associates consolidated with the Town of New Shoreham Harbor Management Plan application.

Docket No.: 2003-05-155

Applicant, Champlin's Realty Associates, filed with the Coastal Resources Management Council ("CRMC") an application for expansion of an existing marina facility consisting of an additional 2,990 linear feet of fixed pier, and 755 linear feet of floating docks, with corresponding expansion of existing marina perimeter limit (area) by approximately 4 acres, however, it should be noted that the requested marina perimeter limit ("MPL"), as filed with CRMC, seeks approximately 13 acres. The stated increase in marina capacity is 140 boats. For the specific totals of the fixed piers, those figures are set forth in the staff reports and incorporated herein by reference. Additionally, this matter was consolidated with the Town of New Shoreham's request for CRMC approval for its Harbor Management Plan. The Harbor Management Plan issues were limited to the location and size of mooring field E.

A duly appointed subcommittee held 23 public hearings, the dates, times and places of which are set forth in the record and incorporated herein by reference, and a workshop on October 24, 2005. Additionally, a pre-hearing conference was convened pursuant to CRMC rules. All hearings were held pursuant to the Administrative Procedures Act. At that time, evidence was submitted on behalf of the applicant as well as other interested parties. Further evidence was submitted by staff members of the Coastal Resources Management Council and by other State agencies, all of which was incorporated into the record. Further, all evidence so submitted to the Council pursuant to this application, whether it be by interested parties, proponents, or the Coastal Resources Management Council by itself, through its staff members, and other various State agencies, has been and is available to all interested parties at the office of the Coastal Resources Management Council, Oliver H. Stedman Government Center, Tower Hill Road, Wakefield, Rhode Island, 02879.

After deliberation upon all the evidence and any legal memoranda and proposed Findings of Fact submitted by interested parties and/or the applicant, the

subcommittee recommended by a three to one vote to the Full Council, to modify the application as submitted and to approve a seaward expansion of the docks 170-feet with a 25-foot marina perimeter limit ("MPL") on the seaward side of that construction. On the sides of the facility, the MPL would be limited to 10-feet. The MPL expansion recommended by the subcommittee totaled 195-feet seaward and would be approximately an additional 3.08 acre increase into the Great Salt Pond ("GSP").

Thereafter, at a meeting held on February 28, 2006, at the Narragansett Town Hall, Narragansett, Rhode Island, the Full Council took under consideration, the record, the evidence therein, the recommendation of the subcommittee, as well as the arguments of the applicant that the Full Council should adopt the subcommittee recommendation. After careful deliberation upon the same, and after a roll call vote that all the evidence, the record and the recommendation of the subcommittee were reviewed and read by the members of the Council, the Council on a 5 to 5 vote to adopt the subcommittee recommendation rejected the subcommittees recommendation. Those CRMC members opposing the subcommittee recommendation ("members opposed") hereby make the following findings of fact and conclusions of law.

FINDINGS OF FACT:

1. The proposed project location is in the Great Salt Pond, ("GSP") Town of New Shoreham, RI.

2. The coastal feature is manmade.

3. The proposed project would be located in Type 3 High Intensity Use Waters.

4. The applicable provisions of the Coastal Resources Management Program ("CRMP") are Sections 120, 200.3, 300.1, 300.4 and 335.

5. The proposed project requires a variance to CRMC Section 300.4.e.1.(b) for parking.

6. During the course of the subcommittee workshop and the Full Council hearing, a clear majority of CRMC members stated on the record that they would not support or approve the application as it was submitted.

7. Consequently, the issue before the Full Council was whether to adopt, modify or reject the subcommittee recommendation which is a part of the administrative record and incorporated herein by reference.

8. Under the CRMC enabling act and CRMC rules and regulations, the subcommittee only makes a recommendation to the Full Council. The subcommittee recommendation is not a decision of the Council, but merely a proposed recommendation to the Council. The Council in its discretion, may adopt, modify or reject the findings of fact or conclusions of law set forth in the subcommittee recommendation. Under longstanding CRMC rules, regulations and practice, the Full Council reviews the subcommittee recommendation *de novo*.

9. In order for an application or a subcommittee recommendation to be approved, a majority of the members present at the Full Council hearing must vote for its approval. Otherwise, under the CRMC statute and rules the recommendation is rejected. Lack of a majority vote operates as a denial of the application.

10. As set forth in the administrative record, the CRMC staff engineer and staff biologist recommended denial of the application as filed.

11. During the course of the proceedings, the following objectors were allowed to intervene:

    (a) Committee for the Great Salt Pond;

    (b) Conservation Law Foundation;

    (c) Block Island Land Trust/Block Island Conservancy.

12. During the course of both the subcommittee hearings and the Full Council hearing, numerous procedural and substantive objections were raised by both the applicant and the objector's. The rulings on those motions have been set forth in the record as well as the rationale for said rulings and to the extent those issues are not moot, those rulings are incorporated herein by reference.

13. Further, the filings and issues associated with the motions for recusal of CRMC Chairman Tikoian and Member Abedon, have been set forth in the record and made a part of the record. The rulings and rationale for said rulings are set forth on the record and are incorporated herein by reference.

14. The subcommittee noted and the Full Council agrees, that all issues associated with jurisdiction have been settled in the case of <u>Champlin's Realty Associates, LP vs. Tillson</u>, 823 A. 2d 1162, (RI 2003).

15. The slides presented at the October 24, 2005 subcommittee workshop and the Full Council meeting by the CRMC staff were for illustration purposes only to aid both the subcommittee and the Full Council in visualizing the extensive

evidence that had been introduced. They were based upon the exhibits actually made part of the record, and these slides were not treated as new or substantive evidence by either the subcommittee or the Full Council. Staff could not prepare these until the entire record was complete.

16. CRMC's enabling act, as well as the CRMP requires that the burden of proof for any proposal is on the applicant. An applicant must demonstrate that its proposal will not (1) conflict with any resources management plan or program; (2) make any area unsuitable for any uses or activities to which it is allocated by a resources management plan or program adopted by the council or (3) significantly damage the environment of the coastal region.

17. As set forth above, the waters which were the subject of this application, are classified as Type 3 High Intensity Boating Waters.

18. The CRMP finds that marinas are the principle means by which the boating public gains access to tidal waters and therefore provide an important public service.

19. Although the CRMP finds that areas suitable for marinas are severely limited and the steady growth of recreational boating is increasing the competition for available facilities, the CRMP finds that the solution to growing demand is therefore to use the available facilities more efficiently and to recycle already altered sites.

20. Type 3 waters and the adjacent shoreline are utilized intensely for the needs of the recreational boating public, nevertheless, they retain numerous natural assets of special concern to the Council such as providing fish and shellfish spawning and juvenile rearing grounds. These factors must be weighed when the Council considers proposals that may impact these assets.

21. The Council's goal as set forth in the CRMP is to preserve, protect and where possible, enhance Type 3 water areas for high intensity boating and the services that support this activity.

22. The highest priority uses of Type 3 waters and adjoining land areas within the Council's jurisdiction are marinas, mooring areas, public launching ramps and other facilities that support recreational boating and enhance public access to tidal waters.

23. The CRMP encourages marinas to seek innovative solutions to increased demands for moorings, dockage and storage space and allows marina operators to alter the layout of their facilities.

24. Pursuant to CRMP § 300.1, an applicant is required to demonstrate that its proposed expansion would not result in significant impacts on the abundance and diversity of plant and animal life; would not unreasonably interfere with, impair, or significantly impact existing public access to, or use of, tidal waters and/or the shore; and will not result in significant conflicts with water dependent uses and activities such as recreational boating, fishing, swimming, navigation and commerce, among other things.

25. The CRMP defines recreational boating facilities to include both marinas and recreational mooring areas.

26. CRMP § 300.4(B)1 encourages marinas to utilize techniques that make the most efficient use of space and increased demands for moorage, dockage and storage space by considering innovative slip and mooring configurations among other things.

27. In order to limit the cumulative impacts of many individual residential boating facilities, the Council encourages the construction of facilities that service a number of users. It is the policy of the Council to manage the siting and construction of recreational boating facilities within the public tidal waters of the state to prevent congestion and with due regard of the capability of coastal areas to support boating and the degree of compatibility of other uses and ecological considerations.

28. The CRMP recognizes that in addressing navigational issues, the United States Coast Guard has primary authority, however, that authority is complemented by among others, local harbor masters.

29. CRMP § 300.4.(B)8 requires persons proposing to construct new marina facilities or proposing to significantly expand existing marina facilities to undertake measures that mitigate the adverse impacts to water quality associated with the proposed activity.

30. CRMP § 300.4.(B)10 requires that all recreational boating facilities shall be designed in a manner which does not impede or detract from and whenever practicable promotes public access along and to the shore.

31. The construction of marinas, docks, piers, floats and other recreational boating facilities located on tidal lands or waters constitutes a use of Rhode Island's public trust resources. Due to the CRMC's legislative mandate to manage Rhode Island's public trust resources for this and subsequent generations, the Council must assess all proposed uses of public trust lands or waters on a case by case and cumulative basis, examine reasonable alternatives to the

proposed activity and ensure that the public's interest in the public trust resources are protected.

32. Pursuant to CRMP § 300.4(B)11, an applicant must demonstrate; (a) the appropriateness of the structure given the activities potential to impact Rhode Island's coastal resources; (b) the appropriateness of the structure given geologic site conditions; (c) the potential impacts of the structure and use of the structure on public trust resources; (d) the potential navigation impacts of the structure and associated use of the structure; (e) the potential aesthetic and scenic impacts associated with the structure; and (f) cumulative impacts associated with the increased density of existing recreational boating facilities in the vicinity of the proposed project.

33. In considering these factors, the Council shall weigh the benefits of the proposed activity against its potential impacts while ensuring that it does not cause an adverse impact on other existing uses of Rhode Island's public trust resources.

34. Although a majority of the subcommittee noted that RIGL § 46-23-6(8) defines marinas as one of the uses consistent with the public trust, it is important to note that § 9 of that statute also deems launching ramps and recreational mooring areas to be uses consistent with the public trust as well.

35. The members opposed do not dispute the subcommittee's finding that the number of boats visiting Block Island has increased and that the cost of acquiring property on Block Island has increased.

36. The CRMP prohibits new recreational mooring fields, docks and marinas in Type 1 waters. Marina's are not allowed in Type 2 waters, however moorings and anchorages are. In Type 3 waters, the CRMC permits marinas.

37. While the members opposed do not necessarily disagree with the subcommittee's findings regarding the allocation of water types in the GSP, the fact that there are Type 3 waters in the GSP does not entitle an applicant to build it all as marinas or to justify the dramatic seaward expansion that is proposed by the applicant. As set forth *supra*, an applicant must utilize its existing facilities more efficiently, explore innovative solutions and demonstrate compliance with Sections 300.1 and 300.4 as set forth below. The members opposed to the subcommittee recommendation do not believe the applicant has carried that burden of proof.

38. The evidence is clear that a more efficient utilization of existing facilities is available to the applicant as well as viable alternatives to expand to the west,

which outweighs the potential negative impacts associated with a seaward expansion encompassing approximately 3.08 acres of public trust resources.

39. Regarding the subcommittee majority's findings as to the value of the CRMC staff's reports and testimony, those CRMC members opposed to the subcommittee recommendation do not believe that the CRMC staff's testimony and reports should be entirely discredited. Many of the points made by the staff are valid, particularly relating to the use of alternative designs, more efficient utilization of the existing facilities and area, and the costs for dredging and expansion to the west.

40. Although the CRMP requires a Water Quality Certificate ("WQC") prior to issuance of an assent, it is well settled that CRMC's review regarding water quality issues is independent and broader than DEM's review of water quality issues.

41. The DEM WQC approved a one-third expansion for the applicant.

42. Those CRMC members opposed do not believe issuance of a WQC alone ensures there will be no detrimental impact to finfish, shellfish or submerged aquatic vegetation. All issues associated with water quality are not resolved by its issuance.

43. The evidence demonstrates that there are still unresolved issues regarding impacts to water quality.

44. For instance, the study by the applicant was conducted in early spring which is at the end of the prime shell fishing season and was conducted only in the vicinity of the existing docks, not in the area of the proposed expansion despite evidence that there were shellfish or finfish in that area.

45. The testimony presented by the applicant acknowledged that the results of the study may have been "skewed" because of the time of year when it was conducted. They further acknowledged that the shell fishing resources within the existing marina might have been harvested prior to the survey. Further, due to the low water temperatures some shellfish species could have been deeper in the sediment than what was surveyed.

46. As a result, the expert recommended that because of those conditions, an additional survey of the shellfish resources be conducted during the fall season, prior to the opening of shell fishing season for the GSP. No such survey has been provided to the CRMC.

47. Therefore, the evidence demonstrates that water quality issues have not been adequately addressed notwithstanding the issuance of the WQC.

48. The evidence demonstrates that Champlin's regularly attracts yachts in excess of 100-feet in length and that it has been used by vessels of at least 165-feet in length.

49. The appropriate size and design of a navigational channel around a marina to provide for a safe maneuvering zone between a marina and a mooring field based upon the evidence before the council is at least 1.5 to 2.0 times the length of the largest vessel that can be expected to use the marina. The evidence demonstrates that a vessel of at least 165-feet is expected to use the marina.

50. Those CRMC members opposed to the subcommittee recommendation, believe the subcommittee made an error in its assumptions regarding navigation issues and the distances between the existing facility and existing mooring field E. Pursuant to the CRMP and explained to the Council by the Executive Director, the appropriate standard to review is the distance between the existing facility and the limits of the existing mooring field not the actual mooring locations.

51. The evidence demonstrates that the distance from the edge of the existing facility is between 310-to 340-feet from the edge of the trapezoid shape identified as the Town of New Shoreham's mooring field in the US Army Corp. of Engineers ("ACOE") permit.

52. Consequently, the appropriate distance to use in assessing navigational impacts is the 310-foot distance to the mooring field.

53. As set forth in the record, main channels need to have enough width for a vessel to maneuver safely and if need be to turn around.

54. Therefore, applying appropriate and proper marine design criteria under the existing situation with a 165-foot vessel utilizing Champlin's facility an appropriate channel would be as much as 330-feet, which is more than the 310-feet available under the current configuration.

55. The harbor master testified that when the 165-foot vessel is utilizing the marina it already causes congestion and if there is an expansion of the facility, that congestion will be worsened.

56. Under the subcommittee's recommendation a 165-foot vessel would not be able to safely maneuver and turn around in the channel if it needed to.

Therefore, the subcommittee recommendation presents a much too narrow channel under any set of accepted design standards that were set forth in the record.

57. The evidence is clear, that the boats Champlin's desires to accommodate by this expansion cannot operate within Champlin's own design parameters and would require significantly more space to maneuver, resulting in serious safety concerns.

58. Although there was testimony that an expansion of approximately 200-feet would be a viable plan, those CRMC members opposed to the subcommittee recommendation do not believe that testimony is credible, nor does it comply with accepted and proper marina design standards.

59. The CRMC should not approve a proposal that does not use proper criteria in its design, meet that criteria, or that will not work in the actual circumstances.

60. The evidence demonstrates that even under existing conditions when there are large vessels at the Champlin's facility there is significant congestion resulting in navigation problems.

61. The evidence demonstrates that the application as submitted and/or the subcommittee recommendation, if approved, would result in an unacceptable impact on the navigation ability of the waterways of the GSP.

62. The existing configuration of the marina allows for a channel between its western most dock and the edge of the ACOE approved mooring area that is approximately at the appropriate width for safe maneuvering of vessels that use these waters. Any expansion of the marina structure to the northwest as presently proposed will unreasonably interfere with navigation in that area.

63. The Champlin's expansion proposal builds on the existing configuration of three main fixed piers. There is a considerable area of water shoreward of the northwest fixed pier that is neither presently utilized for marina facilities nor proposed for use in the requested marina expansion as recommended by the subcommittee.

64. Expansion of the marina toward the shore on the northern fixed pier would require dredging. The credible evidence establishes that the cost of dredging to utilize those waters is approximately $130,000 dollars. The testimony by the applicant's that it would be "cost prohibitive" to expand in that area is not credible. The testimony of the CRMC staff that dredging is a viable alternative and, therefore an alternative layout is viable, is found to be credible.

65. The existing configuration of Champlin's marina is not an efficient utilization of the area of the GSP that it occupies or of the immediately adjacent areas.

66. The area of the GSP between the shoreline and the western most extent of the existing docks could be more efficiently utilized for the construction of docks and operation of a marina.

67. The evidence demonstrates that while expansion to the west may not be able to accommodate vessels of 165-feet, the credible evidence demonstrates that it would be able to accommodate more average size yachts which are more likely to be used by the Rhode Island boating public.

68. The proposed expansion recommended by the subcommittee would build on an already inefficient use of the GSP and impinge on competing existing uses of the area of the GSP into which the expansion is proposed. The proposed expanded marina would not be an efficient use of the public trust waters.

69. The Champlin's application does not embody any innovative solutions to meet what it characterizes as an increasing demand on its facilities.

70. The use of an additional 3.08 acres of the GSP for dockage of a limited number of vessels is not an efficient use of public trust resources.

71. There are existing uses of the 3.08 acres of the GSP which Champlin's seeks to expand, as recommended by the subcommittee, including recreational boating, mooring, shell fishing and fishing.

72. These competing uses would be constricted if not eliminated by the proposed expansion.

73. The applicant has proposed by his public access plan to offer launch service, use of its beach by the public and use of its dingy dock as measures for enhancing public access to the shore in exchange for its requested expansion of its use of public trust resources. The proposed expansion will not maximize the public's use and enjoyment of the public trust, rather, it will only benefit a small segment of the public to the exclusion of a larger segment.

74. The applicant's proposed public access plan differs slightly, if at all, from the existing uses that are in place in the existing marina. Additionally, the applicant's witness stated that currently during the summer the areas adjacent to the beach are not safe for swimming. Therefore the plan does not constitute meaningful access.

75. The applicant's proposed public access plan is inadequate to compensate for the acquisition of public trust resources requested in its application or as recommended by the subcommittee.

76. Champlin's evidentiary presentation did not address in any meaningful way possible alternatives to the expansion plan that was the subject of its application.

77. The applicant's evidentiary presentation did not address in any way the possible cumulative impact of granting its application.

78. Regarding the validity of the Town's HMP, CRMP Section 300.15 requires that all municipalities proposing to adopt harbor rules, regulations, or programs shall apply to the Council for a determination of consistency with the Coastal Resources Management Program.

79. Until such time as a comprehensive harbor management plan is prepared and approved by the CRMC, all activities regulated throughout the CRMP, or taking placed below the MHW mark, must come before the CRMC for review and approval in accordance with the program.

80. The Town's Harbor Management Plan, which was approved in 1991, expired in 1996. The Town did not reapply for a renewal of that plan until at least sometime in 1999. The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC. However, those CRMC members opposed to the subcommittee recommendation find that the appropriate location and delineation of mooring field E should be that as approved and documented in the 1993 ACOE permit.

81. As set forth above, those opposed note that the burden is not on the objector's to present alternatives to the application. The burden of proof is on the applicant.

82. The applicant failed to demonstrate that its proposed expansion would not result in significant impacts on the abundance and diversity of plant and animal life; will not unreasonably interfere with, impair, or significantly impact existing public access to, or use of, tidal waters or the shore; will not result in significant conflicts with water dependent uses and activities such as recreational boating, fishing, swimming, navigation and commerce, among other things.

83. The subcommittee modification of the application if approved would result in an unacceptable impact on the navigability of the waterways of the GSP.

84. The subcommittee modification if approved would result in an unacceptable impingement on other uses of the public of the GSP including the Town's designated mooring areas.

85. The subcommittee modification if approved would facilitate only one priority use of Type 3 waters, marinas, while unacceptably restricting another priority use, mooring areas.

86. Therefore, those CRMC members opposed cannot support or approve the subcommittee recommendation.

CONCLUSIONS OF LAW:

1. This Council has been granted jurisdiction over the above mentioned project by reason of Title 46, Chapter 23 of the General Laws of the State of Rhode Island, as amended.

2. The proposed activity as modified by the subcommittee and set forth above will conflict with the management plan approved and adopted by this Council at the time the application was submitted.

3. The record reflects that the evidentiary burdens of proof as set forth in the Coastal Resources Management Program have not been met for this project.

4. Based upon applicable law and the CRMC rules and practice the 5 to 5 tie vote on the motion to adopt the subcommittee recommendation operates as a rejection of the subcommittee recommendation and in the absence of any other majority action operates as a denial of the application as filed and contained in the subcommittee recommendation.

WHEREFORE, as a result of these Findings of Fact, it appears that the proposed activity as applied for and as modified by the subcommittee does have a reasonable probability of causing a detrimental impact upon the coastal resources of the State of Rhode Island. As a result of these Findings of Fact and Conclusions of Law, the Council hereby denies the application as set forth above.

FOR THE COUNCIL,

DATED:

July 5, 2006

STATE OF RHODE ISLAND
PROVIDENCE, SC.

COASTAL RESOURCES MANAGEMENT COUNCIL
Oliver H. Stedman Government Center
Tower Hill Road, Wakefield, RI 02879

**Findings of Fact of the CRMC Members in Support of the Subcommittee Recommendation**

Petition Of: Champlin's Realty Associates consolidated with the Town of New Shoreham Harbor Management Plan application.

Docket No.: 2003-05-155

Applicant, Champlin's Realty Associates, filed with the Coastal Resources Management Council an application for expansion of an existing marina facility consisting of an additional 2,990 linear feet of fixed pier, and 755 linear feet of floating docks, with corresponding expansion of existing marina perimeter limit (area) by approximately 4 acres, however, it should be noted that the requested marina perimeter limit ("MPL") seeks approximately 13 acres. The stated increase in marina capacity is 140 boats. For the specific totals of the fixed piers, those figures are set forth in the staff reports and incorporated herein by reference. Additionally, this matter was consolidated with the Town of New Shoreham's request for CRMC approval for its Harbor Management Plan. The Harbor Management Plan issues were limited to the location and size of Mooring Field E.

A duly appointed Subcommittee held 23 public hearings, the dates, times and places of which are set forth in the record and incorporated herein by reference, and a workshop on October 24, 2005. Additionally, a pre-hearing conference was convened pursuant to CRMC rules. All hearings were held pursuant to the Administrative Procedures Act. At that time, evidence was submitted on behalf of the applicant as well as other interested parties. Further evidence was submitted by staff members of the Coastal Resources Management Council and by other State agencies, all of which was incorporated into the record. Further, all evidence so submitted to the Council pursuant to this application, whether it be by interested parties, proponents, or the Coastal Resources Management Council by itself, through its staff members, and other various State agencies, has been and is available to all interested parties at the office of the Coastal Resources Management Council, Oliver H. Stedman Government Center, Tower Hill Road, Wakefield, Rhode Island, 02879.

After deliberation upon all the evidence and any legal memoranda and proposed Findings of Fact submitted by interested parties and/or the applicant, the Subcommittee recommended by a three to one vote to the Full Council, to approve the seaward expansion of the docks 170-feet with a 25-foot marina perimeter limit ("MPL") on the seaward side of that construction. On the sides of the facility, the MPL would be limited to 10-feet. The MPL expansion recommended by the Subcommittee totaled 195-feet seaward and would be approximately an additional 3.08 acre increase into the Great Salt Pond ("GSP").

Thereafter, at a meeting held on February 28, 2006, at the Narragansett Town Hall, Narragansett, Rhode Island, the Full Council took under consideration, the record, the evidence therein and the recommendation of the Subcommittee. After careful deliberation upon the same, and after a roll call vote that all the evidence, the record and the recommendation of the Subcommittee were reviewed and read by the members of the Council, a motion to adopt the Subcommittee recommendation was not adopted as a result of a tie 5 to 5 vote. Those CRMC Members in support of the Subcommittee Recommendation ("Members in support") hereby make the following findings of fact.

FINDINGS OF FACT:

1. The proposed project location is the Great Salt Pond, Town of New Shoreham, RI.

2. The coastal feature is manmade.

3. The proposed project is located in Type 3 High Intensity Use Waters.

4. The applicable provisions of the CRMP are Sections 120, 200.3, 300.1, 300.4 and 335.

5. The proposed project requires a variance to CRMC Section 300.4.e.1.(b) for parking.

6. The CRMC staff engineer and staff biologist recommended denial of the application as filed.

7. The Subcommittee allowed the following Objectors to intervene: Committee for the Great Salt Pond, Conservation Law Foundation and the Block Island Land Trust/Block Island Conservancy.

8. During the course of the Subcommittee hearings, numerous procedural and substantive objections were raised by both the applicant and the Objectors. The rulings on those motions have been set forth in the record, as well as the Subcommittee's rationale for said rulings, and to the extent those issues are not moot, those rulings are incorporated herein by reference.

9. The CRMC members in support note that all issues associated with jurisdiction have been settled in the case of *Champlin's Realty Associates, LP v. Tillson* 823 A.2d 1162 (RI 2003).

10. The members in support note the slides presented at the October 24, 2005 workshop by the CRMC staff, were for illustration purposes only to aid the Subcommittee and Full Council in visualizing the extensive evidence that had been introduced, were based upon exhibits actually made part of the record, and these slides are not treated as new or substantive evidence. Staff could not prepare these until the entire record was complete.

11. As set forth above, the waters which were the subject of this application are classified as Type 3 High Intensity Boating Waters.

12. The CRMP finds that marinas are the principal means by which the boating public gains access to tidal waters and therefore provide an important public service.

13. The CRMP finds that areas suitable for marinas are severely limited and the steady growth in the number of recreational boats is increasing the competition for the available facilities. The solution to growing demand is therefore to use the available facilities more efficiently and to recycle already altered sites.

14. Type 3 Waters and the adjacent shoreline are utilized intensely for the needs of the recreational boating public, nevertheless they retain numerous natural assets of special concern to the Council. These factors must be weighed when the Council considers proposals that may impact these assets.

15. The Council's goal is to preserve, protect, and, where possible, enhance Type 3 areas for high intensity boating and the services that support this activity.

16. The highest priority uses of Type 3 Waters and adjoining land areas within the Council's jurisdiction are marinas, mooring areas, public launching ramps, and other facilities that support recreational boating and enhanced public access to tidal waters.

17. The CRMP encourages marinas to seek innovative solutions to increased demands for moorings, dockage and storage space, and allows marina operators to alter the layout of their facilities.

18. The evidence demonstrates that the size of boats visiting Block Island has increased and that the cost of acquiring property on Block Island has increased.

19. The CRMC members in support find that the Great Salt Pond ("GSP") is approximately 611 acres in size.

20. There are 360 acres of Type One Waters in the GSP, which is approximately 59 percent of the pond. In Type One Waters moorings, docks and marinas are prohibited.

21. The members in support find there are 194 acres of Type 2 Waters within the GSP, which is approximately 32 percent of the area. Marinas are not allowed in Type 2 Waters, however, moorings and anchorages are.

22. There are approximately 57 acres of Type 3 Waters within the GSP, which is approximately 9 percent of the pond. As set forth above, marinas are permitted in Type 3 Waters.

23. The members in support of the Subcommittee recommendation find that even if the application as presented to the Council were approved, it would represent a small fraction (approximately less than 2 percent) of the entire area of the GSP.

24. The members in support acknowledge that Type 3 Waters permit both marinas and moorings as high priority uses, it notes that the area available for moorings in the GSP is significantly greater than the area permitted for marinas.

25. All parties to the proceedings acknowledged that there is a demand for additional marina space in the GSP and that there has not been an expansion of marinas in this area for some time.

26. The CRMC members in support of the Subcommittee recommendation find that based upon the evidence presented by the applicants, and the conditions contained in the RIDEM Water Quality Certificate ("WQC"), ensure that the expansion will not have a negative impact upon finfish and shell fish or submerged aquatic vegetation ("SAV").

27. The CRMC members in support find that the CRMC staffs testimony regarding the impacts to these resources was impeached upon cross examination.

28. The members in support find that based upon the evidence presented, as well as the pump outs which would be installed, and the WQC issued by RIDEM, will ensure there will be no negative impacts on water quality.

29. During the course of the hearings, an expert witness for the Town and Objectors, Mr. Roberge, stated that they could accept a 100 foot seaward expansion of the existing facility.

30. Under the Town HMP, the HMP requires a 100 foot buffer between any dock and a mooring field.

31. The members in support of the Subcommittee recommendation find that notwithstanding the arguments of the Objectors that no expansion was acceptable, that position was nullified when their own expert said that an expansion of approximately 200 feet would be a viable plan.

32. As graphically shown on the slides presented by the CRMC staff at the Subcommittee workshop and Full Council, the existing vessels that are med-moored from the seaward end of the existing dock were 170 feet from the end of that dock. Nevertheless, there was 195 feet from the bow of the boat to the mooring field. Consequently there is 365 feet between the existing dock and the existing moorings. Applying the 100 foot buffer set forth in the HMP, the distance between the two would still leave 265 feet.

33. The CRMC members in support believe there is sufficient room seaward of the existing marina to accommodate both an expansion of the marina as well as the needs of the Town's mooring field.

34. The members in support note that under current conditions on occasions a 165 foot vessel is med-moored on the seaward side of the existing facility and that navigation is not significantly impacted at those times.

35. The members in support are also aware of the fact that many Rhode Islanders cannot afford to buy property on Block Island and one of the only ways to access Block Island is to go there by private boat and either utilize a marina or one of the limited moorings available.

36. Based upon the Subcommittee majority's recommendation set forth *infra*, there is sufficient fairway to satisfy the Block Island HMP and accommodate vessels utilizing the area.

37. The members in support of the Subcommittee recommendation note that R.I.G.L. Section 46-23-6(8) defines marinas as one of the uses consistent with the public trust.

38. The CRMC members in support find there are no negative, scenic, or aesthetic impacts as a result of this project, given the location of other marinas in the vicinity and the current uses of the GSP.

39. This project proposes to add an additional pump-out boat to service the pond, to add an additional launch to service individuals on moorings and anchorages, to add shower and toilet facilities available for the people on mooring and anchorages, provide potable water to the users of the pond, to provide trash and garbage disposal for all those who use the pond, and to continue to maintain a dingy dock for public access between the shore and the pond.

40. The members in support find that based upon these proposals public access to the pond will be enhanced.

41. As set forth above, the alternatives offered by the Objectors were acknowledged by their own witnesses to not be reasonable. Further, the argument made by the Objectors that no expansion was possible was contradicted by their own expert who testified various expansion scenarios were viable.

42. The members in support find no reasonable alternatives to Champlin's application were offered by the Objectors.

43. Regarding the parking variance, pursuant to CRMP Section 300.4.e.1(b), the evidence demonstrates this will be a transient marina located on an island and the

patrons of the marina will typically arrive by boat and not require permanent parking spaces for its patrons. This fact was confirmed by the Objectors own witnesses.

44. Regarding the validity of the Towns HMP, CRMP Section 300.15 requires that all municipalities proposing to adopt harbor rules, regulations, or programs shall apply to the Council for a determination of consistency with the Coastal Resources Management Program.

45. Until such time as a comprehensive harbor management is prepared and approved by the CRMC, all activities regulated throughout the CRMP, or taking placed below the MHW mark, must come before the CRMC for review and approval in accordance with the program.

46. The Town's Harbor Management Plan, which was approved in 1991, expired in 1996. The Town did not reapply for a renewal of that plan until at least sometime in 1999. The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC.

47. The CRMC members in support also find that the use of helical moorings by the Town would be more efficient and would allow for more vessels. While not requiring use of same, the members in support strongly recommend the Town consider that option.

WHEREFORE, the undersigned CRMC members support the recommendation of the Subcommittee majority to the Full Council that they approve a seaward expansion of the docks 170 feet with a 25 foot marina perimeter limit on the seaward side of that construction. On the sides of the facility the MPL will be limited to ten feet. The members in support would deny of any new construction to the west. The MPL expansion would total 195 feet seaward and be approximately an additional 3.08 acres increase into the GSP with the stipulations set forth below. The CRMC members in support of the Subcommittee Recommendation would impose the following stipulations:

a. A lighting plan should be prepared by the applicant to tone down the existing lighting and submitted to CRMC staff.
b. The applicant must maintain the existing conditions regarding the pump-out facility, the acceptance of garbage, the continuation of the launch service and to allow anyone in the pond to use the pump-out facilities.
c. In lieu of a lease payment, the applicant will contribute $10,000 a year to the Habitat Restoration Fund, to be used to benefit the restoration of the GSP for a period of five years.
d. Mooring Field E may be expanded to the northeast and southerly area up to 9 moorings, but not towards the Champlin's facility and the moorings are to be shared between residents and non residents.
e. There would be no med-mooring or rafting outside the MPL set forth above. There would be no portion of any vessel or structure outside of the designated MPL.

f. Pump-outs will be required on the new docks, and another bathroom must be installed at the end of the new dock.

g. The total number of vessels permitted within the MPL will be determined by the final DEM WQC.

For the CRMC Members in Support of the Subcommittee Recommendation:

DATED: July 5, 2006