**STATE OF RHODE ISLAND** **SUPERIOR COURT**

**PROVIDENCE, SC.**

CHAMPLIN'S REALTY ASSOCIATES :

v. : 2006- 1659

MICHAEL TIKOIAN, Individually and in his capacity as Chairman of the Coastal Resources Management Council, DAVID ABEDON, Individually and in his capacity as a member of the Coastal Resources Management Council, PAUL E. LEMONT, JERRY SAHAGIAN, RAYMOND COIA, NEILL GRAY, N. JOSEPH SHEKARCHI, THOMAS RICCI, GERALD P. ZARRELLA and MICHAEL SULLIVAN, in their capacities as members of the Coastal Resources Management Council, The TOWN OF NEW SHOREHAM, STATE OF RHODE ISLAND, COASTAL RESOURCES MANAGEMENT COUNCIL, THE BLOCK ISLAND LAND TRUST, THE CONSERVATION LAW FOUNDATION and THE COMMITTEE FOR THE GREAT SALT POND :

# COMPLAINT

## PARTIES

1. Plaintiff Champlin's Realty Associates ("Champlin's") is a Rhode Island corporation, doing business inter alia as a marina in the Great Salt Pond in the Town of New Shoreham, State of Rhode Island.

2. Defendant Coastal Resources Management Council ("CRMC") is an agency of the State of Rhode Island created in accordance with and with duties delineated in Chapter 23, Title 46 of the General Laws of Rhode Island.

3. Defendant Town of New Shoreham, ("Town") is a municipality within the State of Rhode Island and is an objector to Champlin's application for expansion to its marina and itself has an application pending before the CRMC for approval of its Mooring Field E, also located in the Great Salt Pond.

4. Defendant Michael Tikoian ("Tikoian") is Chairman of the CRMC and is sued in both his individual and official capacity.

5. Defendant David Abedon ("Abedon") is a member of the CRMC and is sued in both his individual and official capacity.

6. Defendants Paul E. Lemont, Jerry Sahagian, Raymond Coia, Neill Gray, N. Joseph Shekarchi, Thomas Ricci, Gerald P. Zarrella and Michael Sullivan are members of the CRMC and are sued in their official capacities only.

7. The following Defendants were allowed to intervene as Defendant objectors to Champlin's application by the CRMC over the objection of Champlin's:

   a. The Block Island Land Trust;

   b. The Conservation Law Foundation;

   c. The Committee for the Great Salt Pond.

**COUNT I**

**ADMINISTRATIVE PROCEDURES ACT**

8. Champlin's has pending an application ("application") before the CRMC to expand its marina designated as Docket Number 2003-05-155.

9. The Town's application for approval of Mooring Field E has been consolidated with the aforesaid application of Champlin's.

10. Champlin's application to expand its marina and the hearings thereon before the CRMC is considered a contested case pursuant to the Administrative Procedures Act, G.L. 42-35-1(c) and as such the CRMC is performing a quasi-judicial function.

11. Marinas have been designated to be a use consistent with the public trust pursuant to RIGL § 46-23-6(8).

12. Champlin's application seeks CRMC permission, and issuance of an assent, for an expansion of its existing marina facility located in the Great Salt Pond in the Town of New Shoreham.

13. Pursuant to said application a sub-committee was appointed by the CRMC and charged with hearing Champlin's application and, pursuant to CRMC regulations to render findings of fact and a recommendation to the full Council.

14. The sub-committee conducted twenty-three public hearings over the course of two years, in accordance with the Administrative Procedures Act, G.L. 1956 § 42-35-9. Evidence was received through sworn testimony and exhibits, introduced in accordance with the RIGL § 42-35-10.

15. As part of the application process, Champlin's was required to obtain, and did in fact obtain, a Water Quality Certificate from the Rhode Island Department of Environmental Management. Said Certificate was presented by Champlin's to the sub-committee and accepted as a full Exhibit at said hearings.

16. On or about October 24, 2005 following completion of the evidentiary hearings, the sub-committee convened and, by a 3 to 1 vote, a majority of the sub-committee rendered

forty-seven separate findings of fact and conclusions of law. (See sub-committee recommendation attached hereto as Exhibit A.)

17. The sub-committee further, by a 3 to 1 vote, recommended approval of Champlin's application with modifications and issuance of an assent to Champlin's for its marina expansion.

18. Each of the sub-committee's forty-seven findings of fact was supported by the evidence presented at the hearings before the sub-committee.

19. Among the findings rendered by the sub-committee is a finding that Champlin's proposed marina expansion is totally within Type 3 High Intensity Use Waters and that "marinas are the principal means by which the boating public gains access to tidal waters and therefore provide an important public service."

20. The sub-committee also found that one of the highest priority uses of Type 3 waters is a marina.

21. The sub-committee further found that marina space is severely limited, that the number of recreational boats has steadily grown, as has the competition for available marina space.

22. The sub-committee concluded that the marina expansion proposed by the Champlins' application "would represent a small fraction (approximately less than 2%) of the entire area of the Great Salt Pond and that the area available for moorings and not marinas is significantly greater than the area permitted for marinas."

23. The sub-committee acknowledged that a majority of the citizens of Rhode Island "cannot afford to buy property on Block Island and one of the only ways to access Block Island is to go there by private boat and either utilize a marina or one of the limited moorings available."

24. The sub-committee also found that marinas are one of the uses consistent with the public trust as found by the General Assembly and that there will be "no negative, scenic, or aesthetic impacts as a result of this project, given the location of other marinas in the vicinity and the current uses of the Great Salt Pond."

25. The Chairman of the sub-committee, Paul Lemont, was the lone dissenter; Lemont made no findings of fact nor did he set forth any reasons for his dissent. Lemont's dissent consisted of the following: "I respectfully disagree with the ultimate recommendations of the sub-committee."

26. Under the law and the two-tiered hearing procedure and management practices of the CRMC, the CRMC must accord deference to the findings and recommendations of the sub-committee.

27. Tikoian and Abedon did not sit on the sub-committee nor did either Council member hear the evidence presented by Champlin's or the objectors over the twenty-three hearings.

28. Immediately after the vote of the sub-committee recommending approval of the application as aforesaid, Tikoian spoke to a reporter from the Providence Journal and a reporter from the Block Island Times and declared that he was "totally disappointed" by the vote of the sub-committee and intended to see that Champlin's application was defeated when the application was heard by the full Council.

29. Tikoian later had a second conversation with a reporter from the Providence Journal in which he declared that he had a right to make public statements on a pending case because he had read the transcripts of the hearings.

30. Immediately after the aforesaid vote of the sub-committee, Abedon spoke to a reporter from the Providence Journal, declared his opposition to the application and his intention

to vote against Champlin's application when the application was heard by the full Council.

31. Champlin's moved to disqualify Tikoian and Abedon from further participation in its application based on their public comments, which indicated a lack of impartiality and a pre-conceived prejudice against Champlin's application on the part of both Council members.

32. Champlin's also moved to disqualify Tikoian and Abedon based on a violation of Champlin's right to due process as guaranteed by the Constitutions of the United States and the State of Rhode Island .

33. In late November or early December 2005, Tikoian engaged in a telephone conversation with one Daniel R. Sumner, an attorney licensed to practice law in the State of Rhode Island. During the course of that conversation, Tikoian inquired if Mr Sumner knew counsel for Champlin's and thereupon declared that he was exceedingly unhappy about a motion to disqualify him filed by Champlin's, that Champlin's did not have sufficient votes to obtain a favorable result on its application before the CRMC, and that he, [Tikoian] was not in favor of the application, even as modified and approved by the sub-committee.

34. All members of the CRMC convened on February 28, 2006 to consider the sub-committee's recommendation.

35. At that hearing, in accordance with an earlier obtained order from the Providence County Superior Court, Champlin's pressed its motions to disqualify Tikoian and Abedon, and questioned both under oath.

36. Tikoian admitted under oath that he had discussed Champlin's application with Donald L. Carcieri, Governor of the State of Rhode Island.

37. Both Tikoian and Abedon denied Champlin's motion to disqualify them and refused to recuse themselves from participating in the hearing and voting on Champlin's application.

38. After arguments from Champlin's, the Defendant objectors and discussion among the members of the CRMC, a motion was made and seconded to approve the sub-committee recommendation, and resulted in a tie vote with five Council members voting in favor and five opposed.

39. Following the tie vote on the motion to approve the sub-committee's recommendation, a motion to further modify the sub-committee recommendation failed by a tie vote and a motion to table the application for sixty days also failed by a tie vote.

40. Tikoian and Abedon, voted against approval of the sub-committee recommendation and voted to defeat the other two motions as well.

41. Pursuant to Section 46-23-4 of the General Laws as amended, a majority vote of the members of the CRMC present at a meeting "shall be required for action." Therefore the aforesaid tie vote on the motion to approve the recommendation of the sub-committee by the full CRMC constitutes a final ruling in a contested case adverse to Champlin's.

42. There were no findings of fact or conclusions of law rendered by the full Council of the CRMC with regard to Champlin's application.

43. This final ruling of the CRMC and the denial of Champlin's application and rejection of the recommendation of the sub-committee is a violation of Champlin's rights to due process as guaranteed by the Constitutions of Rhode Island and the United States.

44. Substantial rights of Champlin's have been prejudiced because of the improper participation in this proceeding of quasi judicial officers who have publicly taken positions against Champlin's, who have engaged in ex parte discussions with government officials and who have refused to recuse themselves notwithstanding declared bias and prejudice against Champlin's and its application.

45. Champlin's is entitled to a judgment from this Court granting its application and directing the issuance by the CRMC of an assent for its proposed marina expansion in accordance with the sub-committee's recommendations. This would have been the ruling of the CRMC but for the improper participation of Tikoian and Abedon.

46. The decision of the CRMC denying Champlin's application and rejecting the recommendation of the sub-committee was also:

a. In violation of constitutional or statutory procedure;

b. In excess of the statutory authority of the agency;

c. Made upon unlawful procedure;

d. Affected by other error of law;

e. Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; and

f. Arbitrary, capricious and characterized by abuse of discretion or clearly unwarranted exercise of discretion.

47. Although the CRMC has not provided Champlin's with mailing notice of a final decision as to Champlin's application, the aforesaid tie vote, the effect of which was to deny approval of the recommendation of the sub-committee constitutes a final decision of said

agency denying Champlin's application, and is subject to judicial review pursuant to RIGL § 42-35-15(a) and (b).

**WHEREFORE**, Plaintiff Champlin's Realty Associates pursuant to the provisions of Title 42, Chapter 35 of the Rhode Island General Laws, prays that this Court:

a. Reverse the ruling of the Coastal Resources Management Council denying approval of Champlin's application;

b. Declare the vote taken on February 28, 2006 of the Coastal Resources Management Council null and void due to the participation of Defendants Michael Tikoian and David Abedon;

c. Remand this cause to the Coastal Resources Management Council with directions to issue an assent as to the application of Champlins' Realty Associates in accord with the recommendation of the sub-committee;

d. Order Defendants Michael Tikoian and David Abedon to recuse from further participation in any additional proceedings with regard to the application of Champlins' Realty Associates; and

d. Award to Plaintiff Champlins' Realty Associates such other and further relief as to this Court seems just.

CHAMPLIN'S REALTY ASSOCIATES
By their Attorneys,

By______________________

Robert D. Goldberg #1733
Goldberg Law Offices
226 Cottage Street, P.O. Box 557
Pawtucket, Rhode Island 02862
Tel: (401) 728-1510

By [signature]
Thomas DiPrete #4887
DiPrete Law Offices
2 Stafford Street
Cranston, Rhode Island 02920-4464
Tel: (401) 464-6000

By [signature]
Kathleen Managhan #0355
Houlihan, Managhan & Kyle, LLP
130 Bellevue Avenue, Unit 3
Newport, Rhode Island 02840-7426
Tel: (401) 846-7777

**COUNT II**

**DECLARATORY AND INJUNCTIVE RELIEF – CONSTITUTIONAL GROUNDS**

48. Champlin's repeats and realleges the allegations set forth in Count I as though the same were repeated in full herein.

49. The jurisdiction of the Superior Court as to this Count is invoked inter alia pursuant to GL § 9-30-1 et. seq, the Uniform Declaratory Judgments Act.

50. Pursuant to GL § 42-35-15(a), Plaintiff is entitled to seek declaratory relief as well as review under the Administrative Procedures Act.

51. After the sub-committee voted to recommend approval of the application with modifications and adopted findings of fact and recommendations, Champlin's acquired a constitutionally protected property interest and a right to have its application determined by members of an impartial quasi-judicial body who have not declared their opposition to

Champlin's and its application and have not demonstrated prejudice and a lack of impartiality.

52. Extra-judicial public comment adverse to a litigant before the CRMC by a member of the CRMC is a violation of Champlin's right to due process and to a fair and impartial quasi-judicial proceeding.

53. The CRMC, in deciding a contested case, is acting in a quasi-judicial capacity and exercising both judicial and regulatory authority.

54. When acting as a quasi-judicial body, the members of the CRMC must exercise their statutory authority with strict impartiality, mindful of the due process protections owed to the parties who appear before them.

55. The CRMC, when it functions in a quasi-judicial capacity, serves as an administrative agency that functions much like a court as it hears testimony, receives evidence and makes a decision based solely upon the record, the testimony and the evidence.

56. Following the issuance by the sub-committee of a recommendation which approved Champlin's application with modifications, and which contained findings of fact, conclusions of law and recommendations, the entire CRMC convened on February 28, 2006 to take up Champlin's application.

57. Tikoian and Abedon, despite having previously and publicly expressed disapproval of the sub-committee's recommendations, participated in the hearing, refused to disqualify themselves despite having pre-judged the application, and despite having made prejudicial public comments in violation of their duty to be fair and impartial, and voted to not approve the recommendation of the sub-committee.

**WHEREFORE**, Plaintiff Champlin's Realty Associates prays as follows:

a. That this Court declare that the refusal of Defendants Michael Tikoian and David Abedon to disqualify themselves from participation in Champlin's application was in violation of Champlin's right to procedural and substantive due process, was in violation of the Constitution and laws of Rhode Island, the Constitution of the United States, and the management practices of the Coastal Resources Management Council;

b. That this Court declare that the vote of the CRMC rejecting the recommendation of the sub-committee, in which vote Defendants Michael Tikoian and David Abedon participated, is null and void;

c. That this Court enjoin Defendants Michael Tikoian and David Abedon from any further participation in proceedings with regard to Champlin's application; and

d. That this Court pursuant to RIGL § 9-30-8 reverse the ruling of the Coastal Resources Management Council denying approval of Champlin's application;

e. That this Court, pursuant to RIGL § 9-30-8 remand this cause to the Coastal Resources Management Council with directions to issue an assent as to the application of Champin's Realty Associates in accord with the recommendation of the sub-committee.

CHAMPLIN'S REALTY ASSOCIATES
By their Attorneys,

By ______________________
Robert D. Goldberg #1733
Goldberg Law Offices
226 Cottage Street, P.O. Box 557
Pawtucket, Rhode Island 02862
Tel: (401) 728-1510

By ______________________
Thomas DiPrete #4887
DiPrete Law Offices
2 Stafford Street
Cranston, Rhode Island 02920-4464
Tel: (401) 464-6000

By ______________________
Kathleen Managhan #0355
Houlihan, Managhan & Kyle, LLP
130 Bellevue Avenue, Unit 3
Newport, Rhode Island 02840-7426
Tel: (401) 846-7777

**COUNT III**

**RECUSAL**

58. Champlin's repeats and realleges the allegations contained in Counts I and II as though the same were repeated in full herein.

59. Champlin's is entitled to a hearing on its application and a ruling from a CRMC made up of members who have not pre-judged its application or made public prejudicial comments against Champlin's and its application, and a CRMC comprised of impartial members

who have not previously declared their opposition to the application and their intent to vote against it.

60. As revealed by their public statements expressing disapproval of the sub-committee recommendations in particular and Champlin's application in general, the impartiality of Tikoian and Abedon was called into question such that said Defendants should have disqualified themselves from participating in consideration of Champlin's application.

61. Recusal of a quasi-judicial officer is called for when, as a result of extra judicial comments, the impartiality said officer is reasonably questioned.

62. The standard for recusal based upon prejudicial comments suggestive of a lack of impartiality is an objective test: whether the officer has said or done anything that would lead a reasonable man to believe that he could not make an impartial determination on the matter before him based solely upon evidence presented at a hearing or hearings concerning said matter.

63. Pursuant to said standard, Tikoian and Abedon ought to have recused from participating in consideration of the application by the CRMC, including any vote on the same.

**WHEREFORE**, Plaintiff Champlin's Realty Associates pursuant inter alia to the provisions of Title 42, Chapter 35 of the Rhode Island General Laws, prays as follows:

a. That this Court hold that the participation by Defendants Michael Tikoian and David Abedon in the vote taken by the Coastal Resources Management Council on the motion to approve the sub-committee's recommendations render said vote null and void;

b. Reverse the ruling of the Coastal Resources Management Council denying approval of Champlin's application;

c. Remand this cause to the Coastal Resources Management Council with directions to issue an assent as to the application of Champlin's Realty Associates in accord with the recommendation of the sub-committee;

d. Order Defendants Michael Tikoian and David Abedon to recuse from further participation in any additional proceedings with regard to the application of Champlin's Realty Associates; and

e. For such other and further relief as to this Court seems just.

CHAMPLIN'S REALTY ASSOCIATES
By their Attorneys,

By ______________________
Robert D. Goldberg #1733
Goldberg Law Offices
226 Cottage Street, P.O. Box 557
Pawtucket, Rhode Island 02862
Tel: (401) 728-1510

By ______________________
Thomas DiPrete #4887
DiPrete Law Offices
2 Stafford Street
Cranston, Rhode Island 02920-4464
Tel: (401) 464-6000

By ______________________
Kathleen Managhan #0355
Houlihan, Managhan & Kyle, LLP
130 Bellevue Avenue, Unit 3
Newport, Rhode Island 02840-7426
Tel: (401) 846-7777

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY, IF APPLICABLE.

By ______________________
Robert D. Goldberg #1733

DATED: March 23, 2006

EXHIBIT A

STATE OF RHODE ISLAND
PROVIDENCE, SC.

COASTAL RESOURCES MANAGEMENT COUNCIL
Oliver H. Stedman Government Center
Tower Hill Road, Wakefield, RI 02879

## Subcommittee Recommendation

Petition Of: Champlin's Realty Associates consolidated with the Town of New Shoreham Harbor Management Plan application.

Docket No.: 2003-05-155

Applicant, Champlin's Realty Associates, filed with the Coastal Resources Management Council an application for expansion of an existing marina facility consisting of an additional 2,990 linear feet of fixed pier, and 755 linear feet of floating docks, with corresponding expansion of existing marina perimeter limit (area) by approximately 4 acres, however, it should be noted that the requested marina perimeter limit ("MPL") seeks approximately 13 acres. The stated increase in marina capacity is 140 boats. For the specific totals of the fixed piers, those figures are set forth in the staff reports and incorporated herein by reference. Additionally, this matter was consolidated with the Town of New Shoreham's request for CRMC approval for its Harbor Management Plan. The Harbor Management Plan issues were limited to the location and size of Mooring Field E.

A duly appointed Subcommittee held 23 public hearings, the dates, times and places of which are set forth in the record and incorporated herein by reference, and a workshop on October 24, 2005. Additionally, a pre-hearing conference was convened pursuant to CRMC rules. All hearings were held pursuant to the Administrative Procedures Act. At that time, evidence was submitted on behalf of the applicant as well as other interested parties. Further evidence was submitted by staff members of the Coastal Resources Management Council and by other State agencies, all of which was incorporated into the record. Further, all evidence so submitted to the Council pursuant to this application, whether it be by interested parties, proponents, or the Coastal Resources Management Council by itself, through its staff members, and other various State agencies, has been and is available to all interested parties at the office of the Coastal Resources Management Council, Oliver H. Stedman Government Center, Tower Hill Road, Wakefield, Rhode Island, 02879.

After deliberation upon all the evidence and any legal memoranda and proposed Findings of Fact submitted by interested parties and/or the applicant, the Subcommittee recommends by a three to one majority vote to the entire Council, to find as a matter of fact:

FINDINGS OF FACT:

1. The proposed project location is the Great Salt Pond, Town of New Shoreham, RI.

2. The coastal feature is manmade.

3. The proposed project abuts Type 3 High Intensity Use Waters.

4. The applicable provisions of the CRMP are Sections 120, 200.3, 300.1, 300.4 and 335.

5. The proposed project requires a variance to CRMC Section 300.4.e.1.(b) for parking.

6. The CRMC staff engineer and staff biologist recommended denial of the application as filed.

7. The Subcommittee allowed the following Objectors to intervene: Committee for the Great Salt Pond, Conservation Law Foundation and the Block Island Land Trust/Block Island Conservancy.

8. During the course of the Subcommittee hearings, numerous procedural and substantive objections were raised by both the applicant and the Objectors. The rulings on those motions have been set forth in the record, as well as the Subcommittee's rationale for said rulings, and to the extent those issues are not moot, those rulings are incorporated herein by reference.

9. The Subcommittee notes that all issues associated with jurisdiction have been settled in the case of *Champlin's Realty Associates, LP v. Tillson* 823 A.2d 1162; (RI 2003).

10. The Subcommittee notes the slides presented at its October 24, 2005 workshop by the CRMC staff, were for illustration purposes only to aid the Subcommittee in visualizing the extensive evidence that had been introduced, were based upon exhibits actually made part of the record, and these slides are not treated as new or substantive evidence by the Subcommittee. Staff could not prepare these until the entire record was complete.

11. As set forth above, the waters which were the subject of this application are classified as Type 3 High Intensity Boating Waters.

12. The CRMP finds that marinas are the principal means by which the boating public gains access to tidal waters and therefore provide an important public service.

13. The CRMP finds that areas suitable for marinas are severely limited and the steady growth in the number of recreational boats is increasing the competition for the available facilities. The solution to growing demand is therefore to use the available facilities more efficiently and to recycle already altered sites.

14. Type 3 Waters and the adjacent shoreline are utilized intensely for the needs of the recreational boating public, nevertheless they retain numerous natural assets of

special concern to the Council. These factors must be weighed when the Council considers proposals that may impact these assets.

15. The Council's goal is to preserve, protect, and, where possible, enhance Type 3 areas for high intensity boating and the services that support this activity.

16. The highest priority uses of Type 3 Waters and adjoining land areas within the Council's jurisdiction are marinas, mooring areas, public launching ramps, and other facilities that support recreational boating and enhanced public access to tidal waters.

17. The CRMP encourages marinas to seek innovative solutions to increased demands for moorings, dockage and storage space, and allows marina operators to alter the layout of their facilities.

18. The evidence before the Subcommittee demonstrates that the size of boats visiting Block Island has increased and that the cost of acquiring property on Block Island has increased.

19. The Subcommittee finds that the Great Salt Pond ("GSP") is approximately 611 acres in size.

20. There are 360 acres of Type One Waters in the GSP, which is approximately 59 percent of the pond. In Type One Waters moorings, docks and marinas are prohibited.

21. The Subcommittee finds there are 194 acres of Type 2 Waters within the GSP, which is approximately 32 percent of the area. Marinas are not allowed in Type 2 Waters, however, moorings and anchorages are.

22. There are approximately 57 acres of Type 3 Waters within the GSP, which is approximately 9 percent of the pond. As set forth above, marinas are permitted in Type 3 Waters.

23. The Subcommittee majority finds that even if the application as presented to the Subcommittee were approved, it would represent a small fraction (approximately less than 2 percent) of the entire area of the GSP.

24. The Subcommittee majority acknowledges that Type 3 Waters permit both marinas and moorings as high priority uses, it notes that the area available for moorings in the GSP is significantly greater than the area permitted for marinas.

25. All parties to the proceedings acknowledged that there is a demand for additional marina space in the GSP and that there has not been an expansion of marinas in this area for some time.

26. The Subcommittee majority finds that based upon the evidence presented by the applicants, and the conditions contained in the RIDEM Water Quality Certificate ("WQC"), ensure that the expansion will not have a negative impact upon finfish and shell fish or submerged aquatic vegetation ("SAV").

27. A majority of the Subcommittee finds that the CRMC staffs testimony regarding the impacts to these resources was impeached upon cross examination.

28. The Subcommittee majority finds that based upon the evidence presented, as well as the pump outs which would be installed, and the WQC issued by RIDEM, will ensure there will be no negative impacts on water quality.

29. During the course of the hearings, an expert witness for the Town and Objectors, Mr. Roberge, stated that they could accept a 100 foot seaward expansion of the existing facility.

30. Under the Town HMP, the HMP requires a 100 foot buffer between any dock and a mooring field.

31. The Subcommittee majority finds that notwithstanding the arguments of the Objectors that no expansion was acceptable, that position was nullified when their own expert said that an expansion of approximately 200 feet would be a viable plan.

32. As graphically shown on the slides presented by the CRMC staff at the Subcommittee workshop, the existing vessels that are med-moored from the seaward end of the existing dock were 170 feet from the end of that dock. Nevertheless, there was 195 feet from the bow of the boat to the mooring field. Consequently there is 365 feet between the existing dock and the existing moorings. Applying the 100 foot buffer set forth in the HMP, the distance between the two would still leave 265 feet.

33. The Subcommittee majority believes there is sufficient room seaward of the existing marina to accommodate both an expansion of the marina as well as the needs of the Town's mooring field.

34. The Subcommittee majority notes that under current conditions on occasions a 165 foot vessel is med-moored on the seaward side of the existing facility and that navigation is not significantly impacted at those times.

35. The Subcommittee majority is also aware of the fact that many Rhode Islanders cannot afford to buy property on Block Island and one of the only ways to access Block Island is to go there by private boat and either utilize a marina or one of the limited moorings available.

36. Based upon the Subcommittee majority's recommendation set forth *infra*, there is sufficient fairway to satisfy the Block Island HMP and accommodate vessels utilizing the area.

37. The majority of the Subcommittee notes that R.I.G.L. Section 46-23-6(8) defines marinas as one of the uses consistent with the public trust.

38. The Subcommittee majority finds there are no negative, scenic, or aesthetic impacts as a result of this project, given the location of other marinas in the vicinity and the current uses of the GSP.

39. This project proposes to add an additional pump-out boat to service the pond, to add an additional launch to service individuals on moorings and anchorages, to add shower and toilet facilities available for the people on mooring and anchorages, provide potable water to the users of the pond, to provide trash and garbage disposal for all those who use the pond, and to continue to maintain a dingy dock for public access between the shore and the pond.

40. The Subcommittee majority finds that based upon these proposals public access to the pond will be enhanced.

41. As set forth above, the alternatives offered by the Objectors were acknowledged by their own witnesses to not be reasonable. Further, the argument made by the Objectors that no expansion was possible was contradicted by their own expert who testified various expansion scenarios were viable.

42. The Subcommittee majority finds no reasonable alternatives to Champlin's application were offered by the Objectors.

43. Regarding the parking variance, pursuant to CRMP Section 300.4.e.1(b), the evidence demonstrates this will be a transient marina located on an island and the patrons of the marina will typically arrive by boat and not require permanent parking spaces for its patrons. This fact was confirmed by the Objectors own witnesses.

44. Regarding the validity of the Towns HMP, CRMP Section 300.15 requires that all municipalities proposing to adopt harbor rules, regulations, or programs shall apply to the Council for a determination of consistency with the Coastal Resources Management Program.

45. Until such time as a comprehensive harbor management is prepared and approved by the CRMC, all activities regulated throughout the CRMP, or taking placed below the MHW mark, must come before the CRMC for review and approval in accordance with the program.

46. The Town's Harbor Management Plan, which was approved in 1991, expired in 1996. The Town did not reapply for a renewal of that plan until at least sometime in

1999. The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC.

47. The Subcommittee majority also finds that the use of helical moorings by the Town would be more efficient and would allow for more vessels. While not requiring use of same, the Subcommittee strongly recommends the Town consider that option.

WHEREFORE, the Subcommittee majority recommends to the Full Council that they approve a seaward expansion of the docks 170 feet with a 25 foot marina perimeter limit on the seaward side of that construction. On the sides of the facility the MPL will be limited to ten feet. The Subcommittee recommends denial of any new construction to the west. The MPL expansion would total 195 feet seaward and be approximately an additional 3.08 acres increase into the GSP with the stipulations set forth below. In the event the Full Council approves the Subcommittee Recommendation, the Subcommittee recommends it should impose the following stipulations:

a. A lighting plan should be prepared by the applicant to tone down the existing lighting and submitted to CRMC staff.
b. The applicant must maintain the existing conditions regarding the pump-out facility, the acceptance of garbage, the continuation of the launch service and to allow anyone in the pond to use the pump-out facilities.
c. In lieu of a lease payment, the applicant will contribute $10,000 a year to the Habitat Restoration Fund, to be used to benefit the restoration of the GSP for a period of five years.
d. Mooring Field E may be expanded to the northeast and southerly area up to 9 moorings, but not towards the Champlin's facility and the moorings are to be shared between residents and non residents.
e. There would be no med-mooring or rafting outside the MPL set forth above. There would be no portion of any vessel or structure outside of the designated MPL.
f. Pump-outs will be required on the new docks, and another bathroom must be installed at the end of the new dock.
g. The total number of vessels permitted within the MPL will be determined by the final DEM WQC.

WHEREFORE, the Subcommittee majority recommends to the Full Council that the application as modified be approved as set forth above.

FOR THE SUBCOMMITTEE,

I respectfully disagree with the ultimate recommendations of the Subcommittee majority.

CHAIRMAN

Dated: 01·10·06