UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
CHAMPLIN'S REALTY ASSOCIATES
VS. C.A. NO.:06-135ML
DONALD L. CARCIERI,
Governor of the State
of Rhode Island, KENNETH
K. McKay IV, Chief of
Staff to the Governor of
the State of Rhode Island
and John Does, 1 through 5

DEPOSITION OF DANNI GOULET, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at Goldberg Law Offices, 226 Cottage Street, Pawtucket, Rhode Island, on July 12, 2006, at 2:00 p.m.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

2

APPEARANCES:
FOR THE PLAINTIFF: GOLDBERG LAW OFFICES
BY: ROBERT D. GOLDBERG, ESQUIRE
THOMAS H. DiPRETE, ESQUIRE
FOR THE DEFENDANT: STATE OF RHODE ISLAND COASTAL
RESOURCES MANAGEMENT COUNCIL
BY: BRIAN A. GOLDMAN, ESQUIRE
FOR THE DEFENDANT: SPECIAL COUNSEL
GOVERNOR CARCIERI CLAIRE RICHARDS, ESQUIRE
AND MR. McKAY
ALSO PRESENT: MIKE SCHRAMA, INTERN

3

I-N-D-E-X
DEPOSITION OF DANNI GOULET
PAGE
Examination by Mr. Goldberg. . . . . . . . . . 5

E-X-H-I-B-I-T-S
PLAINTIFF'S DESCRIPTION PAGE
NO.
1 Notice to Take Deposition 9
2 Newspaper Article 16
3 E-mail dated 11/9/04 24
4 E-mail dated 11/9/04 24
5 Photos 1 through 9
plus e-mails 37
6 Article from Projo.com 53

4

QUESTIONS INSTRUCTED NOT TO ANSWER

PAGE LINE
14 10
30 5
30 19
30 25
31 21
32 1
33 2
33 6
33 10
33 15
45 4
45 8
52 21
54 22
55 2
55 25
60 20
67 15
67 18
67 21
68 3
68 14

5

(DEPOSITION COMMENCED AT 2:24 P.M.)
DANNI GOULET,
having first been duly sworn by the Notary Public,
testified as follows:
THE COURT REPORTER: Please state your
full name and spell it for the record.
THE WITNESS: Danni Goulet (D-a-n-n-i)
(G-o-u-l-e-t).
EXAMINATION BY MR. GOLDBERG:
Q. Mr. Goulet, have you ever had your deposition
taken before --
A. Yes, sir.
Q. -- in a federal proceeding?
A. No.
Q. Okay. And you indicated, yes, meaning state
court?
A. Yes.
Q. Okay. And how many times in a state court
proceeding?
A. Twice.
Q. How long ago was that?
A. Once was about six months ago and the other
one was several years ago.
Q. Okay. And have you ever been a party to a lawsuit
personally?

6

A. No.
Q. And you are here being represented by Mr. Goldman

today?
A. Yes.
Q. And is he representing you in your personal
capacity?
MR. GOLDMAN: I'm representing him as an
employee of the agency.
Q. Okay. Do you have anybody representing you in
your personal capacity?
A. No.
Q. Do you want anybody to represent you in your
personal capacity?
A. Not at this time.
Q. Okay. Now, you understand that this is a
deposition taken under the power and authority of
the United States District Court and you are under
the same oath today that you would be if Judge
Lisi, the presiding justice, were sitting here
today?
A. I do know, yes.
Q. Okay. And you realize that in the federal court
it's much more formal and strict than at a Coastal
hearing. Are you aware of that? The rules are
enforced to the letter and there are very formal
7
proceedings over there. Do you understand that?
A. I do.
Q. Okay. I bring that to your attention because I
assume you've testified many times before the
administrative agency of CRMC; correct?
A. Yes, I have.
Q. Now, if at any time you do not understand a
question that I put to you, please make that known
to me, because everybody is going to assume that
by answering the question you understood the
question. Would you please make it known to me if
you don't understand a question?
A. I will.
Q. Okay. And you understand that should you
deliberately give any incorrect answers, you're
going to be held personally accountable for that?
A. I do.
Q. Okay. Has anybody ever explained to you the
Whistleblowers Act?
A. No.
Q. Have you ever heard of it?
A. I've heard of it.
Q. And what's your understanding of it?
A. It is protection for employees who notify
somebody -- notify authorities of any wrongdoing.
8
Q. By their employers?
A. By their employers, yes, sir.

Q. And you understand that, if need be, you could potentially come within the protection of that Act?
A. I didn't, but I do now.
Q. Okay. You understand that if during the course of this deposition something occurs to you where you would like to correct or reform a prior answer that you have given, that I will give you the opportunity to do that?
A. Okay.
Q. And if you feel it necessary to do that at any time, will you make that known to me?
A. I will.
Q. Now, you were served with a subpoena to be here today; correct?
A. Yes, I was.
Q. And is this a fair and accurate copy of the subpoena with which you were served?
A. Yes.
MR. GOLDBERG: Okay. If there be no objection, I would mark the notice to take deposition and the subpoena as one exhibit. Is that fine?
9
MS. RICHARDS: No objection.
(Plaintiff's Exhibit 1 marked for ID.)
MR. GOLDMAN: At the appropriate time when we get into the subpoena, I do have a matter I need to make on the record, which I have previously notified Mr. Goldberg about, about what documents could or could not be produced in the areas of inquiry. I can do that now if you want, I can wait until you get into what he's brought with him in the subpoena.
MR. GOLDBERG: I'll give you an opportunity momentarily to do that.
MR. GOLDMAN: Okay.
Q. Now, the subpoena, as you pointed out to us at the start of the deposition was in the wrong name. Your name is not Daniel, it's Danni?
A. That is correct.
Q. Okay. And what's your home address?
(Witness conferred with Mr. Goldman.)
A. 111 Grant Street, Attleboro.
Q. Massachusetts?
A. Yes.
MR. GOLDBERG: And under the current rules of procedure in the court, in my opinion -- and obviously I am not directing you as your
10
counsel -- you're not allowed to ask for assistance from Mr. Goldman in answering a

question. If you don't understand it, let that be
known.
THE WITNESS: Okay.
Q. Now, you were requested, or in the language of a
federal subpoena, you were commanded to produce
and permit inspection and copying of documents
listed in Exhibit A. Did you do that? Did you
bring the documents requested in the attachment to
your subpoena?
A. I brought the documents for attachment A for
number 1, yes.
MR. GOLDMAN: At this point, it's
appropriate for me to put my objection on the
record. As I have previously notified Mr.
Goldberg in a phone call, I have -- and the agency
has no objection to Mr. Goulet producing any
plans, maps, drawings, designs or proposals
submitted to the Office of the Governor.
Any other plans, maps, drawings, designs or
proposals to the extent they exist, which were
used by the CRMC staff or the CRMC council members
in aiding them in forming their opinions,
recommendations, or that were part of their
11
deliberations on the Champlin's application are
covered by the deliberative process privilege and
I am so invoking that.
Any and all notes, memoranda, records of any
and all conversations, communications, meetings or
actual conversations between Mr. Goulet and any
CRMC members are covered by the deliberative
process privilege and I am so invoking that.
Mr. Goulet has produced the maps, drawings,
designs, proposals, whatever was submitted to the
caucus of the Governor, I've advised Mr. Goldberg
of that. I asked him -- or we conferred as to
whether or not I should just file a motion for a
protective order prior to this deposition.
We agreed that we would go forward; he would
ask his questions and to the extent I feel that it
gets into the deliberative process privilege, I
will invoke my right under the rules and terminate
the deposition and file the appropriate memo.
To the extent you want to inquire about what
Mr. Goulet presented to the Office of the
Governor, I think that you're entitled to that.
But, if you intend to get into any communications
between Mr. Goulet and any CRMC members, I will
then terminate the deposition pursuant to the
12
rules.
MR. GOLDBERG: Certainly I do intend to

get into those areas that you mentioned and I question this so-called deliberative process privilege in any application it may or may not have to this witness. However, I do intend to proceed with the deposition and I'm not seeking to convince you of anything, Mr. Goldman. I'm just putting a few comments on the record for clarity purposes.

I do believe the better way to proceed is to have a question or a request pending and then should you seek to advise the witness not to answer based on privilege and you set forth the privilege, then that question would be obviously held in abeyance till we can get a ruling from the court as to how to proceed.

I don't believe it's appropriate to stop the deposition from any and all questions because there's a privilege claim to one or two questions. Having said that, I think I'm also entitled to a privilege log of what documents were produced -- excuse me, which were prepared and not produced in response to the request for production of the subpoena for production.

13

That privilege log, as you're aware, is to include a description of the document and the basis for claiming the privilege. Just merely to produce what you want and say the rest of the documents are privileged does not meet the spirit or intent of the rules.

Q. Having said that, Mr. Goulet, what did you bring with you in response to Subpoena Exhibit A-1?

A. I have the presentation that was presented to the Governor. I also have -- on that presentation there are letters marked 1 through 9, that was the presentation. Portions of this presentation marked 1 through 5 were e-mailed to Mark Adelman of the Office of the Governor, and this is the e-mail.

Q. Okay. Let me run through this with you again, if I could.

A. Yeah.

Q. In the upper right-hand corner of the documents you have a numbering sequence. In the lower left-hand corner, you have a numbering sequence?

A. Correct.

Q. What is the distinction between the two corners?

A. The lower left corner is the number and sequence of the presentation. This is a printout

14

of the PowerPoint that was given to the Governor's office.

Q. The lower left?
A. The lower left, yeah.
Q. And the upper right?
A. The upper right corresponds to the e-mails that were sent to Mark Adelman where it will say 1 of 5, 2 of 5, and so forth. This would be the 1 of 5.
Q. Okay. Now, are there other plans, maps, drawings, designs or proposals, other than those marked as exhibits in the hearing process for Champlin's Marina, including but not limited to any and all plans submitted to the Office of the Governor of the State of Rhode Island, which you have not produced here today; and I think that's a yes or no --
MR. GOLDMAN: Objection. I am informing the witness not to answer that question based upon the deliberative process privilege.
MR. GOLDBERG: Okay. You're directing him not to tell me if any other plans even exist?
MR. GOLDMAN: That's correct.
Q. Okay. Now, request number 2 in Exhibit A called for any and all notes, memoranda, records of any
15
and all conversations, communications, meetings had by Mr. Goulet with any person, firm, corporation or governmental entity concerning Champlin's Marina, including but not limited to Michael Tikoian, Paul Lemont, representatives of the Town of New Shoreham or any other objectors to the Champlin's proposal and/or any member of the staff of the Office of the Governor of the State of Rhode Island and/or the Governor of the State of Rhode Island. Did you bring any documents in response to that request?
MR. GOLDMAN: I'm going to put in an objection. He can answer that, obviously, but subject to what I said is that he was instructed not to bring any notes, memoranda, records, or any records of any conversations, communications to the extent they exist between Michael Tikoian and CRMC member, Paul Lemont. Everything else was produced.
MR. GOLDBERG: Are you claiming the privilege on behalf of the agency?
MR. GOLDMAN: It is on behalf of the agency and its members.
MR. GOLDBERG: Are you aware that members of the agency have specifically waived any
16
privileges and the other members of the agencies have spoken freely to the press and thereby waived

any potential privileges as well. Are you aware
of that?
MR. GOLDMAN: I'm not answering your
questions but I know that one member, Mr.
Zarrella, has indicated that he wishes to testify
in the administrative process in Superior Court.
No other member has indicated such a willingness
nor has any privilege been waived and I'll leave
it at that.
MR. GOLDBERG: I would also add here that
the witness himself has a right to testify, should
he choose to do so; notwithstanding any other
claims that you may have. However -- also, I'd
like to point out -- if we could mark this for the
record.
(Plaintiff's Exhibit 2 marked for ID.)
MR. GOLDMAN: I don't know -- I'm not a
party to litigation so I don't know that I can
object to you putting something in.
MR. GOLDBERG: Correct.
Now, it has been recorded that members
Zarrella, Tikoian -- excuse me, Zarrella, Ricci
and Sahagian have spoken to the press as set forth
17
in Plaintiff's Number 2 for this deposition. I
would suggest to you that Mr. Tikoian recounts in
the same article that he has done mailings to
people regarding these instances. I would suggest
in the very first instance that that activity
recorded in this article constitutes a waiver of
any so-called claimed privilege.
Secondly, it should be the witness's, or
is the witness's option to testify if he so
chooses and he is not bound by any direction or
instruction from counsel for his employer,
Coastal.
Mr. Goulet, do you wish to answer any of
these questions?
THE WITNESS: I don't understand what
you're asking me. Can you say it from the
beginning?
MR. GOLDBERG: Yes. Mr. Goldman has
indicated that he's directing you not to answer
questions based on the claim of the agency
privilege. I'm suggesting to you that it is your
right to still answer the questions if you so
choose. Do you wish to answer the questions
notwithstanding his objections?
MR. GOLDMAN: I am just going to object to
18
that characterization. I do not believe it is his
privilege to waive. So, I'll put that on the

record as well.
THE WITNESS: At this time, I do not.
MR. GOLDBERG: You do not wish to testify?
THE WITNESS: Correct.
Q. Okay. Now, what, if anything, did you bring in response to request number 2? I asked you that a moment ago and I frankly lost track of the answer. Would it be fair to say nothing?
A. That is correct.
MR. GOLDMAN: Could we go off the record for one second.
(Discussion was held off the record.)
MR. GOLDMAN: We can go back on.
Q. BY MR. GOLDBERG: Now, you have been employed at Coastal Resources Management what, four years now?
A. Yes. Approximately that.
Q. Okay. And, how is it that you acquired this employment? How did you get the job?
A. I applied for it.
Q. Okay. And did anybody in particular recommend you?
A. Not that I'm aware of.
Q. Prior to having this job, did you know Mr.
19
Tikoian?
A. No, I did not.
Q. Did you know Mr. Lemont?
A. No, I did not.
Q. Did you know anybody associated with Coastal?
A. No, I did not.
Q. Well, you had dealt with Coastal in your prior career, hadn't you?
A. Yes. I did not do much work in Rhode Island prior to coming to Coastal but I had done work. I had submitted permit applications to the agency.
Q. And who did you deal with at the agency on those permit applications?
A. Tom Mederos (phonetic) was the person I dealt with.
Q. Anybody else?
A. I think it would have been Tracy Silva as well.
Q. Anybody else?
A. No.
Q. Now, do you know whether you're an at-will employee or whether you have protections under the Rhode Island Civil Service Act?
A. I do not know.
Q. And what's your specific job title at present?
20
A. Dredging coordinator.
Q. Now, is it fair to say that there are at least two

classifications or classes of jobs over there? Some people are policy staff and some people are permit staff. Is that fair to say?
A. That is fair to say.
Q. And which category, if either, do you fall into?
A. As always, there's the exception to the rule and I operate in both of the departments.
Q. Okay. And who's your immediate supervisor?
A. Mr. Fugate.
Q. And are you the only employee that operates in both of the departments?
A. No.
Q. How many others do?
A. There are two others.
Q. And who are they?
A. They would be David Alves and Janet Freedman.
Q. And what are their basic jobs?
A. David Alves is the aquaculture coordinator and Janet Freedman is the Coastal geologist.
Q. And you are the dredging coordinator; correct?
A. Correct.
Q. What does that job require you to do?
A. To coordinate dredging activities for the
21
state and develop policy for the state in regards to dredging.
Q. So, if I understand you correctly, on applications for dredging, whether in the application process or prior -- excuse me, subsequent after approval, you would work with the people and supervise or monitor the dredging?
A. I would not supervise the dredging, I would monitor it, yes.
Q. Did your monitoring of dredging include the dredging of the commercial channel in Narragansett Bay?
A. The Providence River project?
Q. Yes.
A. Yes, it did.
Q. And did you go out to that scene with the Governor and review the progress at one point?
A. Yes, I did.
Q. Okay. And Mr. Lemont also went that day too, didn't he?
A. I believe he did.
Q. Okay. And Mr. Lemont was directed to, on that day, to update the Governor on the Champlin's project, wasn't he?
MR. GOLDMAN: Objection. I'm going to
22
assert the deliberative process privilege.
MR. GOLDBERG: I would specifically

indicate that that privilege has been waived.
I've received correspondence from Mr. Tikoian
indicating exactly what I suggested in the
question and that it's out there and it absolutely
is a waiver of any claim or privilege on that.
MR. GOLDMAN: I'm asserting privilege.
Q. Okay. Now, were you present when Mr. Lemont
briefed the Governor on that trip on the
Champlins's project?
MR. GOLDMAN: Again, I mean, if you're
going to go down this road, I'm just going to
terminate it. The focus of the subpoena was the
presentation made by Mr. Goulet to the Governor.
Why don't you go into that and then I'll move to
terminate. Otherwise, I mean --
MR. GOLDBERG: I have many, many areas of
inquiry for the witness. It's my discretion as to
the areas of -- the sequence of the areas I choose
to go into. If you are going to terminate the
deposition at this stage, certainly there's
nothing I can do about it if you direct the
witness to leave now and you, yourself, leave,
other than file a motion and seek appropriate
23
remedies.
MR. GOLDMAN: I will let you go a little
further but, as I said to you, if we're going to
get into the areas of deliberative process then I
will need to invoke my right under the rules.
MR. GOLDBERG: I'm going to ask my
questions. What you do in response to them, I
cannot control, but I am not going to withhold
questions on the threat that you're going to
invoke the privilege and leave. I still have the
right to ask the questions.
MR. GOLDMAN: Well, I have a right, so
we're clear, to seek a protective order. I
discussed that with you, that I was contemplating
seeking a protective order. We agreed we would
start the deposition and that if we got into the
area of the privilege then I would invoke the
right to seek the privilege.
MS. RICHARDS: Is this the e-mail I sent
you a better copy of?
MR. GOLDBERG: Yeah, it is. I will give
you a better copy before we leave.
MS. RICHARDS: Okay.
MR. GOLDMAN: I can't read this. Do you
have a better copy of it?
24
MR. GOLDBERG: Yeah, if I can find it.
Can we mark the copy that Mr. Goldman --

(Plaintiff's Exhibit 3 marked for ID.)
MR. GOLDBERG: And then we will mark the best copy I have today as the next exhibit.
(Plaintiff's Exhibit 4 marked for ID.)
MR. GOLDMAN: What was the last -- I forgot what the last question was.
(Question read back.)
MR. GOLDMAN: I suppose he can answer if he knows the answer to it. I withdraw my objection on that.
THE WITNESS: Could you just tell me what the last question was?
MR. GOLDBERG: I'll rephrase the question.
Q. Now, I asked you, prior to the discussion among counsel, whether or not you were present when the Governor went out to visit the Providence River dredge, and you indicated to me that you were present; is that correct?
A. That is correct.
Q. And you indicated that Mr. Lemont was also present?
A. That is correct.
Q. And what was the approximate date of that event?
25
A. I have no idea. I did a tremendous number of trips for people out to see the dredge. So, I don't recall.
Q. How many did the Governor go on?
A. Only one, I believe.
Q. How many did Mr. Lemont go on?
A. At least two that I can recall.
Q. And when approximately were they?
A. I'm sorry, I don't recall the dates on the trips.
Q. Would it have been before November 9th of '04?
A. Again, I can't be certain.
Q. Okay. I'll show you at this point Plaintiff's Exhibit Number 4.
A. The legible or illegible?
Q. You tell me. The last question I had prior to showing you Plaintiff's Number 4 was whether or not the trips with Mr. Lemont to the Providence River dredge project were before November 9th of '04. As you can see, that is the date of the exhibit at the top. Does that refresh your recollection?
A. No, sir, it does not.
Q. Okay. So, did you discuss the Champlin's application with the Governor on this dredging
26
occasion when he was out there?
A. No, I did not.

Q. Would it be fair to say that you were not even
involved in the Champlin's application at that
time?
A. That would be correct.
Q. When did you first become involved in the
Champlin's application?
A. At the end of the testimony when the record
was complete. I am not sure of the -- what that
date was. Excuse me, I had one prior portion
dealing with the dredging, as you are aware, the
dredging portion of the review.
Q. Well, just for purposes of the record and to
refresh your recollection, my records indicate
that you did, in fact, testify in the contested
hearing on July 7th, 2005, 6:00, at South
Kingstown Town Hall. Does that refresh your
recollection?
A. Yes. That would be for the dredging portion
of it, yes, I did that.
Q. And what did you do to prepare for that testimony?
A. For that testimony I reviewed the -- I did one
small portion reviewing the applicant's dredging
information, soundings, as part of the --
27
determining whether or not it was reasonable or
not to dredge and if the cost estimates were
reasonable or not.
Q. Who asked you to do that?
A. It was either Mr. Anderson or Mr. Fugate as
part of the review of the application.
Q. Prior to giving that testimony, isn't it true that
you did have a discussion with Mr. Prentiss?
A. I don't recall.
Q. You don't recall one way or another?
A. No, I don't.
Q. You don't recall Mr. Prentiss saying he was asked
to analyze the dredging analysis in the dredging
cost estimate? Do you recall Mr. Prentiss saying
that about you?
A. During the --
Q. Yeah.
A. I guess I don't understand what you're asking
me.
Q. Well, do you recall Mr. Prentiss said that during
the hearing, indicating what you were asked to do?
A. Specifically, no, I do not.
Q. Okay. But does that refresh your recollection in
any way as to whether or not you had spoken to Mr.
Prentiss prior to giving your testimony?
28
A. No, it does not.
Q. Okay. Now, who asked you to get involved in this

project?
A. The dredging portion of it?
Q. No, the design of plans and alternatives. Who asked you to do that?
A. Mr. Fugate directed me.
Q. Okay. When did he do that?
A. At the conclusion of all of the testimony.
Q. Did you consult with any other staff members in your preparation of your alternative plans?
A. No, I did not.
Q. Did you make any of the other staff members aware of the fact that you were doing alternative plans?
A. I believe some staff members knew, as I was using our computer lab which is a public --
Q. Public place?
A. Or staff place, yes.
Q. And who else knew of the plans that you were doing?
A. I can't speculate on who knew. I mean, you could come in and out at will.
Q. Now, you showed these plans to Mr. Tikoian; correct?
A. Yes.
29
Q. Okay. And you showed them to Mr. Lemont?
A. Yes.
Q. Okay. And you showed them to the Governor?
A. Yes.
Q. Okay. And you went to a meeting at the Governor's office?
A. Yes, I did.
Q. And who was present at that meeting?
A. I believe -- well, it was myself, Mr. Fugate, Mr. Tikoian, the Governor. It believe it was Mark Adelman and Jeff Grybowski.
Q. When did you design these plans?
A. After the -- there are various time frames in here. Things that came from the record were done at the close of the evidence and before the workshop.
Q. The subcommittee workshop?
A. Correct.
Q. And then you did other plans after the subcommittee workshop; is that what you're implying?
A. Yes.
Q. And did you show these plans, the ones you did prior to the subcommittee workshop to anybody? Did you show them to anybody?
30
A. Yes, we already --
Q. Who did you show them to?

A. We saw the ones that were done prior, we saw them at the subcommittee. You saw them.
Q. I'm sorry, let me clear up my question. Prior to the subcommittee workshop, did you show these plans to anybody?
MR. GOLDMAN: I'm going to object on the deliberative process privilege to the extent you're going to try and ask if he showed these plans to any CRMC member.
Q. Did you show them to anybody?
A. Yes.
Q. Did you show them to counsel for any of the parties prior to the subcommittee meeting?
A. No, I don't think so.
Q. Why not?
A. I'm sorry, I don't understand.
Q. Why didn't you show them to counsel for either side prior to pulling them out at the subcommittee meeting?
MR. GOLDMAN: I'm going to object and order him not to answer. That goes to the deliberative process privilege.
Q. You were, in fact, directed not to show them to
31
counsel; isn't that true?
A. (Witness nods in the affirmative.)
MR. GOLDMAN: Same objection. I instruct him not to answer.
MR. GOLDBERG: The witness seems to be nodding his head in the affirmative. I'd just like to --
Q. Is that a correct observation?
A. That is an incorrect observation.
Q. Okay. Yes, you were nodding in the affirmative --
A. Yeah, okay. All right.
Q. -- in response to my last question.
MR. GOLDMAN: Well, let's clarify that. Why don't we find out whether the witness's head was just moving or whether he was giving you an affirmative answer.
(Question read back as requested.)
MR. GOLDBERG: If they want to dispute your taking of this deposition, that's up to them to do so.
Q. Now, in fact, you showed these plans prior to the subcommittee meeting to selective members of the subcommittee; correct?
MR. GOLDMAN: Objection. Same objection. I instruct him not to answer.
32
Q. Now, where did you get the figure of 100-foot seaward expansion from?

MR. GOLDMAN: Objection. Same
deliberative process.
Q. What prompted -- strike that. Had you ever gotten
involved in the project after it was completely
over and then done plans of this nature before?
A. I don't understand what you're asking me.
Q. Now, this case, you indicated that other than one
brief appearance for testimony, you did not
participate in the hearings; correct?
A. That is correct.
Q. You did not go to the hearings?
A. That is correct.
Q. Other staff members on CRMC had been there for
every single hearing?
A. I assume so, yes.
Q. And they would be Mr. Anderson and Ms. Silva?
A. Uh-hum.
Q. Is that a yes?
A. I believe so. I don't know if they attended
every one.
Q. Okay. And do you know them to be competent in
their field of expertise?
A. Yes, I believe they're competent in their
33
field.
Q. Is there a reason you did not consult with them in
your drawing of the plans?
MR. GOLDMAN: Objection. I instruct him
not to answer.
Q. Now, you were told by Mr. Tikoian to construct
100-foot plan; isn't that correct?
MR. GOLDMAN: Objection. Instruct not to
answer.
Q. And you discussed these plans that you prepared
with both Mr. Tikoian and Mr. Lemont; isn't that
correct?
MR. GOLDMAN: Objection. Instruct not to
answer.
Q. And you showed these plan to Mr. Sahagian; isn't
that correct?
MR. GOLDMAN: Objection. Instruct not to
answer. If we're going to go down this road about
the council members, I'm just going to move for
protective order on this. This whole line of
questioning about council members -- any
discussions he had with council members regarding
these plans, I'm going to object to under the
deliberative process privilege. Is it your intent
to keep asking questions on this?
34
MR. GOLDBERG: I have questions on many,
many numerous and diverse areas. I think the

proper procedure is to put as many questions as possible for the court to review and rule on specific questions rather than stopping at a few questions, coming back, and then being faced with the same objection and having to go back to court again.
MR. GOLDMAN: What I'm saying to you though is, if you want to move onto another area that does not involve any discussion, deliberations, recommendations, advisory opinions that he may have given or may not have given to council members, why don't we move to that area. Otherwise, if you're just going to ask the same question the same way then this is a waste of everybody's time, and let me just go file my motion for protective order and then we can move onto the other areas that you want.
Q. Now, you were present at the vote of the subcommittee correct?
A. Yes, I was.
Q. And I believe that you referred to that as the "subcommittee workshop," that meeting?
A. Yes.
35
Q. Okay. And you had prepared many more slides and plans than you have brought here today for presentation at the subcommittee workshop; isn't that true?
A. That is incorrect.
Q. Okay. Are these plans the only ones that were prepared at the time of the subcommittee workshop?
A. No.
Q. Okay. Had you done others?
A. No.
Q. And you had done these plans which were marked, the ones you brought with you today?
A. Yes.
Q. But there are others who had prepared other plans?
A. No. Let me help you, Mr. Goldberg.
Q. Go right ahead.
A. I didn't have the subcommittee recommendation which is in here or in here.
Q. Okay. Well, let's take this opportunity to mark these and then we'll clarify a few things. These color copies that you have brought with you today, you have more copies of these?
A. I have these copies. This is the printout of a PowerPoint presentation.
Q. These documents that I am holding in my hand, you
36
indicated you were producing in response to the subpoena?

A. Yes.
Q. Okay. And is this the only set of those documents that you have?
A. I guess I don't understand what you're asking me. It's a computer file. So, we can print out 1,000 of them.
MR. GOLDBERG: Okay. Then I will mark these originals as -- I'm calling them originals because it's what you've handed me in response to the request as the next exhibit and designate it as those documents produced in the response to the request for subpoena.
Q. You will also have additional copies of these same ones; correct?
A. These are additional copies of what you have, yes.
Q. And these are identical?
A. Yes, they are.
MR. GOLDBERG: We'll mark these 5.
MR. GOLDMAN: Do you want to mark them 5A through --
MR. GOLDBERG: Well, they have numbers on them.
37
(Plaintiff's Exhibit 5 marked for ID.)
Q. Now, did you draw up -- I think you've testified to this already today and I want to be clear. You drew up further plans after the subcommittee meeting?
A. I drew up a plan after the subcommittee meeting.
Q. And what did you do with that plan?
A. I provided it to you. This one is the subcommittee recommendation.
Q. This is 5/4 or 5/6. You prepared 5/6 after the subcommittee meeting; correct?
A. That is correct.
Q. Subcommittee workshop. And you also brought this plan to the Governor's office?
A. That is correct.
Q. Okay. Now, other than this 5/6, did you prepare any other plans after the subcommittee workshop?
A. No, I did not.
Q. Okay. And what was the purpose of bringing these plans to the Governor's office?
A. To provide an overview of the Champlin's project.
Q. Okay. And how was that meeting arranged?
A. I was told by Mr. Fugate to go to this meeting
38
and --
Q. Meeting with the Governor?

A. Correct.
Q. And who was the chairman of the meeting, if you
understand my question. Who ran the meeting?
A. The Governor -- I'm really not -- I guess
there was no facilitator at the meeting.
Q. Mr. Tikoian was there?
A. That is correct.
Q. Where did the meeting take place?
A. At the State House.
Q. Okay. And what room, if you could describe it for
me.
A. It's on the first floor, if you walk in, to
the far right.
Q. Far right?
A. Yeah. The Governor's conference room, I
suppose.
Q. On the first floor, the policy conference room or
policy office?
A. It was my first and only time there. So, I'm
not sure if that's the correct place.
Q. Very end of a corridor?
A. I don't think it was the very end but it was
close.
39
Q. Okay. And then at the meeting there was from
Coastal, yourself; correct?
A. That's correct.
Q. Mr. Tikoian?
A. That is correct.
Q. Mr. Fugate?
A. That is correct.
Q. Those are the only people from Coastal there?
A. Yes.
Q. And did you all three go to the meeting together?
A. Yes.
Q. Where did you three meet up?
A. At Mr. Tikoian's office.
Q. Okay. In Providence?
A. In Providence.
Q. His accounting office?
A. His accounting office.
Q. How many times have you been to his accounting
office in the past?
A. A fair number of times because that's where we
have policy and planning meetings.
Q. Okay. And policy and planning meetings of
Coastal?
A. Correct.
Q. About how many such meeting have you attended at
40
his accounting office?
A. A round number is probably ten. I don't keep

track of them.
Q. Do you recognize the telephone number 640-8719?
A. No.
Q. You don't?
A. No.
Q. Okay. How long did the meeting last with the Governor?
A. About a half hour, maybe a little bit longer.
Q. It was scheduled for a full hour, are you aware of that?
A. No, I was not.
Q. But you're saying it didn't take the full hour?
A. No.
Q. Was there any time during the meeting where you were asked to leave the room?
A. During the meeting?
Q. Yes.
A. No.
Q. Were you asked to leave the room earlier than it ended or to not come in until after it had started?
A. No.
Q. So, you were there for the entire meeting?
41
A. Correct.
Q. When were you first told of the meeting?
A. The meeting was on a Friday. It was earlier that week. It could have been a Monday or Tuesday. It was somewhere around there.
Q. And the meeting was the Friday immediately following the subcommittee workshop; correct?
A. Yes.
Q. That would have been the meeting of October 28th, 2005?
A. Yes.
Q. Okay. And tell me everything you can remember that was said during the course of that meeting?
A. Can I use these?
Q. Whatever it takes.
A. My purpose was to give the Governor an overview. So I explained to him what Champlin's -- what the existing facility looks like, what the existing permits are, the existing permitted Army Corp. mooring field, some of the distances from the facility to that mooring field, some of the distances from the largest vessel that call on Champlin's. Then I gave him -- let him view a photo submitted by the applicant.
MR. GOLDMAN: Do you want to just
42
reference -- just so the record is clear.
THE WITNESS: Would you like me to do

that?

MR. GOLDBERG: I want the witness to answer as he sees fit.

THE WITNESS: Okay.

A. That was on slide number 1 that I explained -- this was a picture during the summertime when the facility was under most use. They happened to have the large vessel there. Then I went on to -- this was from the applicant's application. This was what was requested in terms of expansion and, again, there's the distances from the proposal as well as the overlaying of the large 165-foot vessel that calls on the facility.

I also outlined the marina perimeter that was requested as part of that application. Then I discussed the water depth in there and that the survey done by the applicant and the Land Trust were very similar. Both showed two rocks. The Land Trust just happened to be a bit easier to read, which is why they're included in here. Then this was a blowup of it. It detailed the water depths in and around the facility.

Then I explained the subcommittee

43

recommendation of what they recommended as far as 170-foot expansion seaward for structures. The ability to have vessels 25 feet on the outboard side of the vessels but no further than that and what that was in relation to the permitting mooring field.

Then I overlaid that same subcommittee recommendation to the best I could. This is a not-to-scale photo. So, it is just trying to roughly get 5 feet outside of the large vessel, put the mooring field on and showed some of the moorings that are impacted by the mooring field lines.

I also showed him the closest dredge material disposal site to Champlin's. Then I showed some alternatives -- an alternative to the expansion that would meet the goals of the 165-foot vessels being able to service them, as well as have some expansion, as well as maintaining some navigation through there.

Then I also explained that there were some issues with the mooring field that had to be corrected as part of the town as well.

Q. My question was to tell me everything that was said during the course of the meeting. Now you've

44

just run through apparently what you said during the meeting. What did other people say that you

recall?
A. The -- I gave a presentation very similar to what I just gave you. There were -- I don't recall any questions. They tend to be -- they were minor in asking for clarification of items but that was it. It was more of a monologue than a dialogue.
Q. What did the governor say during the meeting?
A. Not much that I can recall.
Q. What did Mr. Tikoian say?
A. I don't believe he said anything, but nothing that I can recall.
Q. You don't recall anything he said during the meeting?
A. It was basically me presenting this. It was a PowerPoint not a -- it was on a screen as opposed to on the plans.
Q. Did you make notes of the meeting anywhere?
A. No, I did not, I was speaking.
Q. I mean, after you left?
A. No, I did not.
Q. Now, this was the first time in your career and only time in your career at Coastal where you were
45
asked to go to the Governor's office with the chairman?
A. Correct.
Q. Okay. And what discussion did you have with the chairman before the meeting?
MR. GOLDMAN: Objection. Same deliberative process privilege.
Q. And did the chairman tell you what to say and what not to say during the course of the meeting?
MR. GOLDMAN: Objection. Same objection.
MR. GOLDBERG: Are you directing him not to answer?
MR. GOLDMAN: I'm directing him not to answer.
Q. Isn't it true that the meeting was set up at the request of -- strike that. At who's request was the meeting set up?
A. I'm not sure. I was just told to attend.
Q. Now, just in passing, let me ask you, why did you use different configurations for the existing marina in these various plans?
A. I'm sorry, I don't understand.
Q. Why did you use different configurations for the existing marina in these various plans?
A. I heard it the first time and I still don't
46
understand what you're asking me.
Q. Well, let me just, for example, show you -- your

number 1 --
A. Yeah.
Q. -- shows a particular configuration of the
existing marina.
A. Yeah.
Q. Okay. And then we go to your number 2 and it's a
completely different configuration for the
existing marina; isn't that correct?
A. Uh-hum, yes.
Q. And why did you not then use the same
configuration for the existing marina in all of
your presentations?
A. This was from?
Q. Number 1.
A. Number 1 was from the record. So, that's why
I used this photograph.
Q. Well, wasn't number 2 from the record?
A. Yes. But it's not an aerial photo.
Q. Weren't there other photos of the existing marina
in the record?
A. Not ortho (phonetic) photos.
Q. You're saying those are the only exhibits of the
existing marina?
47
A. These are the existing exhibits that we had
available in digital form that I could prepare
overlays on.
Q. Did you tell the Governor that these were not
accurate depictions of the existing marina?
A. The perimeter is exiting --
Q. I didn't ask you about the perimeter. I just
asked about the existing marina in toto.
A. The -- what you're asking me -- I guess I
don't understand the question because I believe it
to be misleading.
Q. Did you see anybody in the meeting take notes?
A. I believe the Governor's staff people took
notes.
Q. Would that be Mr. Grybowski?
A. Yes. I think both of the governor's staff
people were taking notes.
Q. And that would be who?
A. I think Mr. Adelman was at the meeting and Mr.
Grybowski.
Q. Was Mr. McKay there?
A. I'm not sure. I don't know who Mr. McKay is.
I believe it was the first time I met these
people.
Q. Okay. Were the issues concerning the marina
48
discussed in that meeting?
A. I don't understand what you're asking me.

Q. Well, did anybody discuss in that meeting the pros and cons of the proposal?
A. Other than the presentation that I gave you and sort of outlying the impacts to various items, that's what was discussed at the meeting while I was there.
Q. So, you're telling me that there was no other discussion at the meeting as to the benefits of the proposal as opposed to the potential detriments?
A. The presentation that I gave, I didn't have any opinion one way or the other. I presented what was in the record.
Q. You didn't have an opinion one way or the other?
A. I was asked to present what was in the record.
Q. Do you know why you were asked to do it and not a member who had sat through all the hearings?
A. No, I do not.
Q. Did you make any inquiry ever to anybody in that regard?
A. No, I did not.
Q. Okay. Didn't it seem odd to you?
A. No.
49
Q. Even though you had never done it before?
A. Never done what before?
Q. Going to see the Governor and explain a project that you were not involved in throughout its time at Coastal?
A. In preparation of this I reviewed the entire record of all -- however many volumes there were. So, I was able to review the record without having gone through all of the iterations that are normal in the permitting process.
Q. Isn't it true that at that meeting Mr. Tikoian was speaking against the applicant's proposal?
A. I don't believe that was happening at any time when I was in the room.
Q. But you were in the room for the whole meeting?
A. Correct.
Q. Okay. Isn't it true that Mr. Tikoian told the Governor that he preferred a much smaller expansion than was proposed?
A. Again, I was not there. If he did that, I was not there.
Q. Isn't it true that at that meeting Mr. Tikoian told the Governor that he supported the 100-foot proposal as did Mr. Lemont?
A. Not while I was there.