Q. And isn't true that there was discussion at that meeting about the town wanting to expand its mooring field?

A. In one of the slides I discussed the town's mooring field and the fact that they can't achieve their authorized number in the area that they have.

Q. And what did other people in the room say about that?

A. During my presentation there was nothing.

Q. How about after your presentation ended?

A. I left.

Q. Immediately?

A. As soon as I cleaned everything up, yes, sir.

Q. And did everybody else leave?

A. Mr. Fugate and I left.

Q. Okay. Mr. Tikoian stayed?

A. Yes.

Q. And he stayed in the room with the Governor and his staff?

A. I don't know.

Q. Okay. But he stayed in the room and you left the room?

A. Correct.

Q. Why did you leave the room before Mr. Tikoian

left?

A. I was asked to give a presentation and that's what I did and then we were to leave.

Q. Now, earlier -- "we were to leave," who said you were to leave?

A. That's all -- I guess the Governor said thank you at the conclusion of our presentation and we packed up and left.

Q. He excused you and Mr. Fugate and Mr. Tikoian stayed, is that what happened?

A. Yes.

Q. Okay. And you and Mr. Fugate waited outside for Mr. Tikoian?

A. No.

Q. Well, weren't you all in the same car?

A. It's a short walk.

Q. From where to where?

A. From the State House to where the cars were parked at Mr. Tikoian's office.

Q. And where is his office?

A. On Weybosset Street.

Q. Okay. So you and Mr. Fugate left Mr. Tikoian there?

A. Correct.

Q. With the Governor and his staff?

A. Yes.

Q. Now, I thought I asked you some time ago whether or not you were there for the entire meeting and whether any of it took place before you got there or after you left the room, and you told me no, that you were there for the entire meeting.

A. I believe you asked me if any of the meeting happened beforehand. I don't recall you asking me if anything happened after.

Q. Would you like that read back or would you like to clarify that point right now?

A. Well, we can clarify that is the case, that I gave the presentation and that's my extent of the meeting. Mr. Tikoian remained, I don't know how long.

Q. But you know for a fact he did remain?

A. He was in the room when Mr. Fugate and I left.

Q. Okay. And when you left the building, he was still on the scene?

A. Yes.

Q. And it was, in fact, Mr. Tikoian that told you to draw up plans for a lesser expansion; isn't that true?

MR. GOLDMAN: Objection. I instruct him not to answer, deliberative process privilege.

Q. Now, isn't it true that Mr. Tikoian clearly indicated to the Governor and his staff, in your presence, that he was against the Champlin's proposal? And I -- just to refresh your recollection would remind you that his position had been clearly stated in the Providence Journal immediately prior to that meeting.

MR. GOLDMAN: I object to the form. That's two questions. Could you ask one question.

Q. Does that clarify your recollection at all?

A. What are you asking me?

Q. I am asking you -- let's do it this way.

MR. GOLDBERG: Could we mark that.

(Plaintiff's Exhibit 6 marked for ID.)

Q. You're certainly free to review the whole exhibit but I have just circled the point in red that I wish to draw your intention to, but should you wish to review the entire exhibit, please take your time and do so.

A. I guess -- what is the question?

Q. First, I'm asking you to review the portion I've indicated in red in that exhibit but also allowing you to look at the whole exhibit, if you wish to.

A. Okay.

Q. Now, the meeting that we've been discussing in the

Governor's office was October 28th, 2005; correct?

A. That is correct.

Q. I direct your attention to my last question.

A. Can you just rephrase it so I understand.

Q. Isn't it true that Mr. Tikoian indicated to the Governor that he was against the Champlin's proposal?

A. I don't believe that is true.

Q. Okay. Well, you were aware when you went into the meeting that Mr. Tikoian was totally disappointed with the vote of the subcommittee?

A. I read that in the paper as you did as well.

Q. No. You had read that in the paper prior to the meeting with the Governor?

A. Correct.

Q. And you were aware of that?

A. Yes.

Q. And so you read it in the paper on the Tuesday, October 25th, 2005 edition of the Providence Journal?

A. Yes.

Q. And you knew that before you read it in the paper, didn't you?

MR. GOLDMAN: Objection. I instruct him not to answer according to the deliberative

process privilege.

Q. Isn't it true that you participated in meetings where you showed members of the subcommittee prior to their workshop these plans that are in Plaintiff's Exhibit Number 5?

MR. GOLDMAN: Objection. Same objection. Instruct him not to answer.

Q. Now, you sat through the workshop, correct, the subcommittee workshop?

A. That is correct.

Q. Okay. And Mr. Lemont at that workshop supported the 100-foot plan shown on the diagram; is that correct?

A. The diagram was never part of the subcommittee workshop.

Q. Well, it was shown?

A. No, it was not.

Q. It was not shown?

A. No, it was not.

Q. But he did, in fact, support a 100-foot plan at the workshop?

A. That is what he stated, yes.

Q. Okay. He stated repeatedly; correct?

A. I would have to review the record.

Q. And is it just coincidental that you happened to

have at that workshop a 100-foot plan?

MR. GOLDMAN: I'm going to object on the deliberative process privilege as to why he prepared that. That's privileged.

Q. Why did you not show your 100-foot plan at the workshop?

A. Because, if you recall, you jumped up and down screaming that anything that we show would be -- that you would leave the workshop or something to that effect. So, to acquiesce to your concerns, we did not show anything.

Q. Okay. Because your recollection is I said I would leave the workshop if it was shown?

A. Or something to that effect, yes.

Q. Well, isn't it true, in fact, that other members of the subcommittee are the ones that said they would leave the workshop if it was shown and it wasn't me that said that at all? I have the transcript of the workshop, if you wish to review it.

A. I would have to review it to be able to answer directly.

Q. I have it right here. I have it right here for you.

MR. GOLDBERG: Just for purposes of the

record, I'm showing the witness the transcript of the Monday, October 24th, 2005 subcommittee workshop at East Providence City Hall.

MR. GOLDMAN: Are you going to direct him to a page?

THE WITNESS: If you want me to read the whole thing, I will.

MR. GOLDBERG: I would suggest to you that it is not in there. I never said that I would leave the workshop and I defy you to find it in there where I said that. I would suggest to you that it was other members of the subcommittee who, in fact, told you that. And I would suggest to you that your revelation in that regard is a further waiver of any claimed privilege.

MR. GOLDMAN: Mr. Goldberg, are you testifying today or are you asking --

MR. GOLDBERG: I'm asking the witness if that document refreshes his recollection or my comments in any way refresh his recollection as to who said they would leave the workshop. If you would like the area of the transcript where I did, in fact, jump up -- I don't recall jumping down -- but where I did, in fact, jump up, I would be happy to show it to you.

THE WITNESS: Would you like me to read this whole transcript? I will sit here and do it.

MR. GOLDBERG: It's up to you, whatever you want to do.

THE WITNESS: It's your show, sir.

MR. GOLDBERG: This is not a show. It's a very serious proceeding and you are placing yourself in great jeopardy in my humble opinion by giving evasive answers to my questions.

THE WITNESS: Mr. Goldberg, I'm trying to answer your questions as specifically as I can.

Q. What is your recollection at this time as to who said they would leave the workshop if you showed those plans?

A. I'm not quite sure whether it was you or one of the subcommittee members or several of the subcommittee members. I would have to review the document to be able to know that for sure.

Q. I would suggest to you that nowhere in the document is there such a comment from myself, nor is there one from the subcommittee members in that transcript.

A. Okay.

Q. But, if you would like to look and verify that, be my guest.

A. Okay.

Q. In fact, wasn't it a member Zarrella, Sahagian and Ricci who indicated -- members Zarrella, Sahagian and Ricci who indicated that they would leave the workshop if you showed that 100-foot plan?

A. I'm not 100 percent certain.

Q. Was it any of them?

A. I'm not sure. I'm not certain. I'm not 100 percent certain.

Q. What's your best recollection?

A. I've already given you my best recollection. I don't -- that is how I remember being told to limit the presentation to only the first three or four of these.

Q. And who told you that?

A. I believe it was Mr. Fugate.

Q. Mr. Fugate told you. And when did he do that?

A. At some point during the hearing or workshop, whatever you want to call it.

Q. So you said you only showed three or four of them?

A. Correct.

Q. Which three or four did you show at the workshop?

A. To the best of my recollection it would be numbers 1 through 5. However, I'm not certain that 4 and 5 were shown.

Q. At the subcommittee workshop?

A. At the subcommittee workshop.

Q. But 6, 7, 8 and 9 were certainly not shown at the workshop?

A. Certainly not because this was a subcommittee recommendation. It didn't exist at that point and the other alternative drawings were not shown.

Q. But they were, in fact, shown to the governor?

A. Yes.

Q. Okay. And they were, in fact, shown to Mr. Tikoian?

A. Yes.

Q. And this was prior to Mr. Tikoian's vote on the full committee -- strike that. This was prior to Mr. Tikoian's vote at the full council level. You showed these to the Governor and to Mr. Tikoian prior to Mr. Tikoian's vote at the full council level?

A. Correct.

Q. Okay. And did you have any further discussion of these plans with any members of the council between the subcommittee vote and the full council vote?

MR. GOLDMAN: Objection. Deliberative process. I instruct him not to answer.

MR. GOLDBERG: I would suggest that the question calls for a yes or no answer, which encompasses discussions beyond internal only and would include even under your reading, Mr. Goldman, non-privileged, i.e., if he discussed these plans with non-Coastal members or employees.

MR. GOLDMAN: I thought you said Coastal members.

MR. GOLDBERG: I said with anybody. Well, I'd like to clarify it with anybody.

MR. GOLDMAN: Well, I object to the extent that that would include Coastal members. I don't have a problem him answering the question of whether or not he discussed those plans with non-CRMC members.

MR. GOLDBERG: All right. Let me rephrase the question and just be eminently clear on this because it is so important to this case and to this witness personally.

Q. Did you discuss any of these plans that have been marked as Plaintiff's 5 with anybody after the subcommittee meeting? And anybody is a yes or no answer. I'm not asking you who at this stage.

MR. GOLDMAN: You can answer that.

THE WITNESS: Okay.

A. But I just want to -- did I discuss anything in any of these plans with anybody after the subcommittee? Is that what you're -- I just want to be clear what you're asking me.

Q. Yes. Okay. Treat it that way.

A. So, did these come up at any time after that?

Q. Did you discuss them with anybody after the subcommittee meeting?

A. The entire plan package?

Q. Any of them. Any of them.

A. Yes.

Q. And we know already that you discussed them at the meeting with the Governor?

A. Yes.

Q. Okay. And did you discuss them with anybody, either staff or non-staff, at any time other than at the meeting with the Governor? And I am just looking for a yes or no answer.

A. I don't understand.

Q. Other than the meeting with the Governor, did you discuss these plans with anybody at any time since the subcommittee vote?

MR. GOLDMAN: I'm going to object. I'll let him answer but that is such a vague question.

MR. GOLDBERG: I'll narrow it down.

MR. GOLDMAN: Why don't you narrow it down to --

MR. GOLDBERG: Let's get a start. If the answer is no, there's nowhere to go.

MR. GOLDMAN: Fair enough.

A. The answer is yes, as you know.

Q. Okay. And how many times did you have such discussions?

A. I'm not sure.

Q. More than one?

A. Yes, more than one.

Q. More than ten?

A. I'm not certain.

Q. Did you ever have any discussions with Coastal members about these plans with non-Coastal members present?

MR. GOLDMAN: And by non-Coastal members, do you mean --

MR. GOLDBERG: Non-Coastal council members or staff members.

A. I don't think so, no.

Q. Now, did you ever speak about this project with Mr. Adelman from the Governor's office?

A. Yes, he called and I e-mailed him these according to the e-mail.

Q. You mailed him Plaintiff's 5?

A. Yes.

Q. When did you do that?

A. On October 25th.

Q. You e-mailed your PowerPoint presentation to Mr. Adelman?

A. Yes.

Q. Now, he called you on the telephone?

A. I think so, yes.

Q. And what did he say to you?

A. I think he was trying to get some background information prior to -- and my recollection is vague on this. I don't have any notes of the phone conversation but I believe he was trying to get some background information on Champlin's.

Q. And he called you direct?

A. I believe so, yes.

Q. Was that the first time you'd ever spoken to him?

A. I think so, yes.

Q. Okay. And had you ever met him at any occasion before that?

A. I believe I met him on the dredge tour. He may have been there.

Q. Did he ask you any questions about Champlin's on the dredge tour?

A. No, he did not.

Q. Okay. And the dredge tour, once again, was when?

A. I don't recall.

Q. Back in '04?

A. I'm not sure.

Q. Well, it was prior to the date on Plaintiff's 2, which is 11/9/04; correct?

A. I would assume so, yes. I honestly don't recall. I gave literally, you know, hundreds of tours, about 100 tours on that dredge. So, the specific ones, I don't recall.

Q. But Mr. Adelman was on one of them?

A. I believe he was with the Governor.

Q. Okay. On the one time?

A. On the one time the Governor was there, yes.

Q. And I assume he started the conversation -- Mr. Adelman from the Governor's office.

A. I'm sorry?

Q. I assume he started his conversation with you on the telephone, Mr. Adelman, from the Governor's office; is that correct?

A. I don't recall but I would assume so, yes.

Q. Did you recognize his voice on the phone?

A. No.

Q. Okay. And specifically what did he say to you on

that call?

A. I don't recall specifically.

Q. Generally, did he tell you he was trying to gather information on Champlin's?

A. I think that was the call, yes. I don't recall the specifics of it.

Q. Okay. But can we agree that the Governor's tour of the dredging project was before this letter from Mr. Tikoian in Plaintiff's 3 where he is recounting it in the past tense.

A. I would presume so, yes.

MR. GOLDMAN: That's 3 and 4?

MR. GOLDBERG: Yes.

A. Yes. It would seem obvious, yes.

Q. Okay. So you knew him from then back in '04?

A. I met him one time. There was a substantial number of people on all of these tours.

Q. Okay. And then you heard from him again on Tuesday, October 25th, '05?

A. Yes.

Q. Okay. And that was the same date that Tikoian's comment had been in the paper?

A. Yes.

Q. Okay. And just coincidentally on that day Mr. Adelman called you about the Champlin's project;

correct?

A. I'm assuming it's not a coincidence but he did call that day.

Q. Okay. And did he and you discuss the newspaper article at all?

A. I don't recall.

Q. One way or the other?

A. I don't recall.

Q. Okay. And did he and you discuss Mr. Tikoian's reported opposition to the project?

A. I don't recall.

Q. Did he and you discuss Mr. Abedon's reported opposition to the project?

A. I don't recall.

Q. Did you ever discuss this issue with Mr. Abedon?

MR. GOLDMAN: Objection. Deliberative process privilege.

Q. Did you in any form ever show these plans in Plaintiff's 5 to Mr. Abedon?

MR. GOLDMAN: Objection. Same objection.

Q. I believe that calls for a yes or no. It could have been in public, it could have been with other people present?

MR. GOLDMAN: If it was part of the discussion that Mr. Goulet may or may not have had

with Mr. Abedon during the deliberative process, I object to it and instruct him not to answer.

Q. Well, did you at any time, it's not just during the deliberative process, discuss these plans with Mr. Abedon?

MR. GOLDMAN: Again, I'm objecting to it.

MR. GOLDBERG: Are you instructing him not to answer?

MR. GOLDMAN: I am instructing him not to answer.

Q. Did you ever discuss this newspaper article, Plaintiff's 6, with Mr. Abedon or Mr. Tikoian?

A. No.

Q. Did you ever discuss their position on the Champlin's project with them at any time, either before or after the full council vote?

MR. GOLDMAN: I'm going to object to the form of that question and to the extent it calls for anything prior to the vote, I'm going to instruct him not to answer. So, if it was after the decision, you can answer it. If it was prior to the decision, do not answer it.

THE WITNESS: Can you please read back the question?

MR. GOLDBERG: I'll rephrase the

questions.

Q. Since the full council vote on February 28th, '06, have you discussed the Champlin's proposal with either Mr. Abedon or Mr. Tikoian?

A. No.

Q. Now, who did you discuss your attendance at today's deposition with?

A. I guess -- who did I inform that I was subpoenaed, is that what you're asking me?

Q. That's part of it.

A. I informed my direct supervisor, Mr. Fugate and I informed -- or Mr. Fugate informed Mr. Goldman.

Q. Okay. Did you discuss this testimony, this upcoming testimony, with Mr. Tikoian?

A. No, I did not.

Q. Did you discuss it with any council members?

A. No, I did not.

Q. On any other staff members?

A. Did I discuss my testimony or the fact that I have to testify?

Q. The fact that you have to testify.

A. Only with Mr. Fugate.

Q. Okay. And what did he say about it?

A. Excuse me, Mr. Willis, who is also the deputy

director, he knows that I must testify as well.

Q. Now, Mr. Adelman called you on the 25th and said what?

A. I don't recall specifically.

Q. The end result was you sent him the plans?

A. That is correct.

Q. Do you have any idea how Mr. Adelman knew on the 25th that you had drawn alternative plans?

A. I presume that in his discussions with either Mr. Fugate or others that he must have been aware.

Q. Now, there was another representative from the Governor's office at the subcommittee hearing; is that correct?

A. It was a room full of people. I presume there was somebody from the Governor's office but I don't recall who it may have been.

Q. Why do you presume that there was?

A. You justify said there was.

Q. I'm sorry?

A. You just said that there was.

Q. Did you have any contact with the Governor's office concerning this project prior to the subcommittee meeting?

A. I'm sorry?

Q. Did you have any contact with the Governor's

office concerning this meeting, the Champlin's project, prior to the subcommittee meeting?

A. I don't think so. Not that I -- no, I don't think so.

Q. Do you know Mr. David Trembly from the Governor's office?

A. No. The name is not familiar.

Q. So, you don't know whether or not he sat with Mr. Tikoian at the subcommittee meeting?

A. No.

Q. Now, do you know why Mr. Tikoian's name plate and a place was reserved for him at the council table at the subcommittee meeting?

A. No.

Q. I just want to be clear. Were these part of your exhibit?

A. I wanted to -- these were -- we had the blue numbers.

Q. Yeah.

A. These correspond to the -- the 1 corresponds to the 1. The 2 corresponds to the 2 because there was an attachment. So, I just wanted to -- you to have the attachments. I just wanted to make sure --

MR. GOLDMAN: That was in response to

Number 2, which is the correspondence with anybody else regarding the Champlin's --

THE WITNESS: It's an e-mail. So I wanted to be --

MR. GOLDBERG: For purposes of the record, I thought we had marked as Plaintiff's Exhibit 5 everything that you had brought in response to the subpoena. Apparently, I was mistaken, and you have now clarified that for me that there are 1, 2, 3, 4, 5 e-mails that you also brought in response to the subpoena; is that correct?

THE WITNESS: Correct, yes.

Q. And the 1 in the -- or the number in the other corner of Plaintiff's 5 corresponds to these various e-mails?

A. Yes. I thought we had already done that once but, yes, that is correct.

Q. Okay.

MR. GOLDBERG: Then I would ask that we mark these e-mails as the next -- collectively as the next exhibit. The e-mails are all part of 5.

THE WITNESS: I thought this was together.

MR. GOLDBERG: Then they are all part of 5.

MR. GOLDMAN: Then 5 will have fourteen

pages to it rather than nine.

MR. GOLDBERG: It's now five minutes of 4:00. We've been going for approximately a couple of hours. It's abundantly clear that Mr. Goldman and myself cannot work out our differences as to our interpretation of the law here this afternoon, and that we're going to have to file motions on behalf of our respective positions and then reconvene this deposition in any event. So, if I do have the agreement of the parties -- with the agreement of the parties, we will suspend the deposition at this time for today and file our motions and then reconvene. I would indicate, however, that I do have many more areas to go into that may or may not prompt Mr. Goldman to wake up and object. So, with that said --

MR. GOLDMAN: I assure you, Mr. Goldberg, I'm awake.

MR. GOLDBERG: This would be continued with the subpoena in full force and effect to hopefully a mutually convenient date.

MR. GOLDMAN: I have no objection to that.

MS. RICHARDS: No objection.

MR. GOLDBERG: Okay. That would conclude today. I would just also ask if we can run out

and copy these right now.

MR. GOLDMAN: I'll take a copy.

MS. RICHARDS: I'll take a copy.

MR. GOLDMAN: Can we just go back on the record. I want to reserve our right to review the deposition before it's certified. Under the federal rules, we have a right to review it to make sure that it's accurate. So, I just want to reserve that right. I'll work that out with you but I just want to put on the record that I reserve that right.

MR. GOLDBERG: Well, I'm not certain that you have that right but I understand you're not waiving any rights. The federal rules provide for it. I think it's not the agency's, it's the witness's rights and I think there are --

MR. GOLDMAN: I'm doing it on behalf of the witness.

MR. GOLDBERG: I think there are a lot of issues here that the witness may want to consult his own counsel. Having said that, you're not waiving that right?

MR. GOLDMAN: He's badgering you.

(Deposition concluded at 4:07 p.m.)

C-E-R-T-I-F-I-C-A-T-E

I, SALLY BRASSARD, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of DANNI GOULET, the witness in the above-entitled cause, was taken before me on behalf of the Plaintiff at Goldberg Law Offices, 226 Cottage Street, Providence, Rhode Island, on July 12th, 2006, at 2:00 P.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Plaintiff's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF I have hereunto set my hand this 20th day of July, 2006.

_________________________________________

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)