**STATE OF RHODE ISLAND** **SUPERIOR COURT**
**PROVIDENCE, SC.**

CHAMPLIN'S REALTY ASSOCIATES :

v. : C.A. NO: 2006-1659

MICHAEL TIKOIAN, Individually and in his :
capacity as Chairman of the CRMC, :
DAVID ABEDON, Individually and in his :
capacity as a member of the CRMC, :
PAUL E. LEMONT, JERRY SAHAGIAN, :
RAYMOND COIA, NEILL GRAY, :
N. JOSEPH SHEKARCHI, THOMAS RICCI, :
GERALD P. ZARRELLA and MICHAEL SULLIVAN, :
in their capacities as members of the CRMC :
The TOWN OF NEW SHOREHAM, STATE OF RI, :
COASTAL RESOURCES MANAGEMENT COUNCIL,:
THE BLOCK ISLAND LAND TRUST, :
THE CONSERVATION LAW FOUNDATION, :
THE COMMITTEE FOR THE GREAT SALT POND, :
and THE BLOCK ISLAND CONSERVANCY, INC. :

# PLAINTIFF'S EVIDENCE OF IRREGULARITIES BEFORE THE COASTAL RESOURCES MANAGEMENT COUNCIL

## I. Introduction

This case is an administrative appeal of an agency decision and is governed by the Administrative Procedures Act, chapter 35 of title 42 of the General Laws. One of the basis of plaintiff's appeal rests upon a claim of bias and prejudice of two members of the Coastal Resources Management Council (CRMC), both of whom made public statements suggestive of bias and prejudice against the plaintiff, Champlin's Realty Associates (Champlin's). Neither member, Michael Tikoian, CRMC Chairman (Tikoian), nor David Abedon, CRMC member (Abedon), were members of the CRMC Subcommittee that heard the evidence in this case (23 hearings and over 3000 pages of testimony). Yet immediately after the vote of the Subcommittee

recommending a reduced expansion of 170 feet and a 20 foot buffer,[1] Tikoian and Abedon publicly stated that they were disappointed with the recommendation, favored a smaller expansion and did not support the Champlin's proposal.

As this Court is aware, Champlin's efforts to disqualify these members from participating in the vote of the full CRMC were unsuccessful. As expected, and consistent with their earlier public declarations, when the full CRMC met to take up the application on February 28, 2006, both Tikoian and Abedon voted against the subcommittee's recommendation. The ensuing vote was a 5-5 tie, resulting in a stalemate. Champlin's duly filed an appeal of that decision pursuant to the Administrative Procedures Act. After this appeal was filed, shocking revelations of misconduct by Tikoian and others were made by sitting members of CRMC. These disclosures and discovery obtained in a federal lawsuit against Governor Donald Carcieri and his then Chief of Staff, Kenneth McKay, reveal a pattern of wrongdoing, designed to deprive Champlin's of a fair hearing and to deny the plaintiff its rights to due process and to achieve a result designed to satisfy the Governor's office.

## II. Background

The full CRMC met on February 28, 2006, over 4 months after the subcommittee workshop.[2] In an effort to build a record, and consistent with this Court's directive, Champlin's attempted to question Tikoian and Abedon about their declared bias. This effort was unsuccessful; Tikoian read a prepared statement that was self-serving and untrue. He refused to

---

[1] The application sought a 240 foot expansion.

[2] The delays in this case are unconscionable. Champlin's waited over four months for the full council to take up the subcommittee's recommendation. Although its so-called decision by an equally divided CRMC, (a legal impossibility) is a nullity, this "decision" was submitted over 4 months after the tie vote and in response to this Court's order. Champlin's submits this is evidence of bad faith on the part of the agency and is a deliberate effort to prejudice plaintiff. This contention is further supported by the affidavit of Jerry Sahagian who testified about Tikoian's efforts to have him replaced before the meeting of the full CRMC. Sahagian's term had expired on January 31, 2006 two months after the vote of the subcommittee, yet Tikoian waited another two months before he scheduled the CRMC meeting. If proven, this conduct violates Champlin's rights to procedural due process. See L.A. Ray Realty v. Town Council of Town of Cumberland, 698 A.2d 202 (1997) (Federal due process clause guarantees a fair procedure and prohibits arbitrary wrongful government actions).

be placed under oath, which is understandable, in light of the material misrepresentations he made on the record.

Specifically, Tikoian declared that he never indicated that his mind was made up "or that I had made a final decision on this matter." He further declared that, "Never at any time did I indicate to anyone what my final disposition on this matter would be." Tikoian lied. Subsequent events and shocking disclosures from his fellow CRMC members reveal the extent of his chicanery and misconduct.

Tikoian also declared that "I did not know how the subcommittee members would vote prior to the workshop[,] nor did I have any personal knowledge of how any of you would vote here today." This statement was also untrue. As Champlin's evidence will demonstrate, Tikoian not only knew where the subcommittee members stood, he actively worked against Champlin's and engaged in inappropriate conduct and ex parte communications, designed to persuade the members of the subcommittee to support a secret 100 foot expansion plan (secret plan) that he caused to be developed by CRMC staff. This secret plan was not in evidence and had never been shown to Champlin's counsel. Yet it was provided to the Governor of this state during a briefing attended by Tikoian, CRMC staff and several members of the Governor's office. This meeting was held ***three days after*** the vote of the subcommittee and after Tikoian's public statements against the plaintiff. It was not, however, the only improper communication between Tikoian and the Governor's staff. Champlin's evidence shows that Tikoian lied at the meeting of the full CRMC and also lied to members of the subcommittee and threatened that they would not be reappointed unless they voted against Champlin's.

CRMC member David Abedon also declined to recuse from participating in the proceeding. Abedon's refusal was based on an equally self-serving prepared statement that is confusing, inconsistent and amounts to an admission of preconceived bias:

> "At the time I made the comments to a Providence Journal reporter. What I said was meant to express a general attitude and was not intended to be specific to Champlin's. When I said favorable or in favor, I was not favoring or opposing any particular proposal. I was not insisting on a reduction in this particular case. I was speaking generally. I was simply stating the obvious point, that if the purpose of a project can be fully achieved with a less intrusive alternative, then, generally speaking, that alternative is superior. At that time, however, I made no judgment as to whether such a less intrusive alternative was actually realistic in this particular case. In order to make that judgment, I knew I would have to read all of the transcripts and hear all of the arguments, which I had not yet done, and my remarks reflected this. In other words, with regard to this particular case, I had not made up my mind, and I was merely making a highly tentative general statement." [Emphasis Champlin's]

Although Abedon acknowledged reading an article that appeared in the Providence Journal article on February 28, 2006, the day of the CRMC meeting, he stated that he did not recall that the article declared that he was likely to vote for a smaller expansion. Champlin's has not yet determined whether or not Abedon was appraised of the secret plan and if so, when. Stay tuned.

Section 42-35-15 of the General Laws sets forth the statutory procedure for an appeal of a contested administrative case. Generally the Court is bound by the record made at the agency level, except in one important respect: where there are alleged procedural irregularities before the agency that are not shown on the record. This is such a case. Section 42-35-15(f) provides:

> "The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court. The court, upon request shall hear oral argument and receive written briefs." [Emphasis added].

After hearing Champlin's motion for an evidentiary hearing, this Court ordered plaintiff to produce affidavits and other evidence not on the record in this case that would be established during an evidentiary hearing. Champlin's has done so.

## III. The Evidence

Attached to this memorandum are affidavits and a paper trail of e-mails, deposition testimony and other documentary proof that provides clear and convincing proof of Tikoian's misdeeds with the Governor of this state and his staff to deprive Champlin's of a fair proceeding. This scheme borders on collusion.

It should be noted that the CRMC members who have provided these affidavits have done so voluntarily. Their reasons for doing so are obvious—On February 28, 2006, Tikoian took the chair at the CRMC to preside over this case and in the presence of the CRMC membership, he blatantly lied about his actions in this case. He made material misrepresentations that flew in the face of his fellow council members who were dragged into this controversy by him. He lied about his involvement in this case; he lied about his ex parte discussions in this case and he lied about his interaction with these affiants. He has corrupted the CRMC, compromised the integrity of the CRMC staff and insulted his fellow commissioners.[3]

In addition to proving Tikoian's dishonesty, affidavits voluntarily prepared by CRMC members Gerald Zarrella, Jerry Sahagian and Thomas Ricci, Esq. reveal an organized effort by Tikoian, Paul Lemont, CRMC Vice Chairman and chair of the subcommittee and CRMC senior staff to deny Champlin's its right to due process and a fair proceeding.

[3] Obviously, Tikoian's ability to remain as CRMC chairman is in serious doubt. That question however, is for another day and a different tribunal(s).

**a. The Zarrella Affidavit**

**(Exhibit A)**

The Zarrella affidavit avers that after the close of evidence and before the vote of the subcommittee, Tikoian contacted CRMC member Zarrella and told him to consider a plan for a 100 foot expansion drafted by CRMC engineer Danni Goulet. This secret plan was drafted by Goulet at the behest of CRMC Executive Director Grover Fugate and at the direction of Tikoian and probably Lemont. Zarrella testified that Tikoian contacted him the day ***before*** the subcommittee workshop and directed him to contact Lemont who would explain the secret plan to him. In one of his many lies, Tikoian informed Zarrella that Tom Ricci was in favor of the plan. Tikoian also stated that Paul Lemont was in favor of the plan and that Jerry Sahagian was against it. Tikoian informed Zarrella that Sahagian "was putting the agency at risk and that he, Tikoian was going to the Governor's office to make sure Sahagian was not reappointed to the CRMC." Simply incredible.

**b. The Sahagian Affidavit**

**(Exhibit B)**

Mr. Sahagian has voluntarily testified by affidavit that he was contacted by Grover Fugate and asked to come to the CRMC office. Upon arrival he was presented with the secret plan and informed that this plan "was acceptable to the CRMC management and the objectors and one that I should consider". Having concluded that Fugate and Goulet were attempting to compromise his responsibilities as a member of CRMC, Sahagian left the meeting, having agreed to nothing, but with his honor intact.

Mr. Sahagian then spoke to subcommittee member Thomas Ricci and learned that Tikoian had appeared at this office to discuss the secret plan and that Tikoian told Ricci that Sahagian was in favor of the plan.

After the subcommittee vote and before the full council vote, Sahagian learned that he would not be reappointed to CRMC if he voted in favor of Champlin's. He learned that Tikoian was responsible for these threats.

**c. The Ricci Affidavit**

**(Exhibit C)**

Thomas Ricci, a CRMC member, an attorney and officer of this court has testified by affidavit that Tikoian engaged in a meeting at his office during which he attempted to persuade Ricci to vote in favor of the secret plan.

**d. The Governor's Office**

As a result of discovery in a related civil action pending in the United States District Court against Governor Donald Carcieri and Kenneth McKay, his then chief of staff, Champlin's has learned of a pervasive and continuing line of communication and collusion between Tikoian and the office of the Governor during this entire proceeding, with the obvious intent to defeat this project and violate Champlin's right to due process and a fair proceeding.

**Exhibit D(1)**

**E-mails from Mark Adelman; Governor's Policy Office**

As early as November 2004, during the presentation of evidence to the subcommitee, Tikoian inappropriately involved himself in this application. On November 9, 2004, Mark

Adelman, a policy aide in the Governor's office contacted "Mike" via e-mail and sought information about the Champlin's application. In what proved to be short lived concern about the quasi judicial nature of this proceeding, Tikoian urged caution because of "the legal ramifications of appeal" in this "highly contested case. I am just being cautious."

However, Tikoian notified Adelman that he had asked Lemont to accompany the Governor on a dredge tour of the bay. "While on the dredge, Paul [Lemont] did update the Governor on the Champlin's application."[4] Thus, one year before the evidence closed before the subcommittee "Mike," although noting that "the agency must be cognizant of the legal ramifications of appeal," made sure that the Governor was briefed, by the subcommittee chairman no less.

Incredibly, the Governor's policy aide responded that CRMC would not be compromised by Tikoian providing information on the town's position and the groups for and against the expansion because this practice "is done with ***every department*** that has ***regulatory functions***." Of course, this was a quasi-judicial proceeding which was none of the Governor's business.

**Exhibit D(2)**

Time marched on and there was a sea change from Tikoian's cautionary sentiments. He publicly declared his opposition to the subcommittee's recommendation and was actively engaged in an effort to deprive Champlin's of a fair hearing.

On October 23, 2005 at 11 a.m., less than ***24 hours*** before the subcommittee vote, Adelman was still working on the Champlin's application and Tikoian's sentiments about the independence of the agency were nowhere in evidence.

---

[4] This evidence raises serious questions about Lemont's impartiality and integrity. An evidentiary hearing may lead to his disqualification for bias as well.

In response to an inquiry from Jeffrey Grybowski, the Governor's deputy chief of staff, Adelman notified Grybowski that he was "talking to the interested parties" (Champlin's was not among them) about the matter and that DEM was digesting a massive report and "summarizing it for the [Department of Environmental Management Director] Sullivan who is sending it to me."[5] Sullivan is a member of the CRMC and voted against the subcommittee recommendation. Adelman notified Grybowski that Tikoian will brief the Governor.

On October 25, 2005, the day after the subcommittee vote, Adelman set about arranging a meeting in the Governor's office at the behest of Ken McKay—the CRMC attendees at this "briefing" are Tikoian, Fugate and a CRMC staff engineer Danni Goulet, the author of the secret plan. Mr. Goulet presented a power point presentation of the secret plan. This meeting was held on October 28, 2005, three days after the subcommittee recommendation.

Two weeks later, on November 8, 2005 Adelman is counting votes. He writes to Grybowski that,

> "Apparently last week, Goldberg filed a motion for Tikoian and Abadon (sic) to recurs (sic) themselves from the full CRMC vote on Champlin's. He is alleging that comments made by both of them reveal their position. Obviously the success of this motion results in a loss of two votes." [Emphasis added]

**Exhibit E**

**Deposition of Danni Goulet, CRMC staff engineer**

Danni Goulet, a CRMC staff engineer was directed by Grover Fugate, CRMC Executive Director, to prepare the secret plan. This plan was presented to the members of the subcommittee

[5] This is a mystery report that, coupled with the secret plan, does not pass the smell test. An evidentiary hearing would facilitate the production of this report. Who prepared the report? Who obtained copies of the report? What did it conclude?

who have given testimony herein. We also know that Lemont was involved in this plan because Lemont was delegated to explain the plan to Zarrella. (See Zarrella affidavit, Exhibit A).

This deposition establishes that a power point presentation, including the secret plan, was given to the Governor of this state ***three days after the subcommittee vote, while the case was pending before the CRMC.*** This evidence discloses that Tikoian also met with the Governor in private after the presentation. The Court will note the number of times that counsel for CRMC (not a party to the Federal proceeding) repeatedly interposed a so-called deliberative process privilege and directed the witness not to testify as to what he knew about this meeting. This demonstrates the need for an evidentiary hearing to learn what happened.

**Exhibit F**

**E-mails from McKay and Grybowski**

Mr. McKay's calendar indicates he attended the briefing on October 28, 2006. He also expressed concern about Champlin's expansion to the Governor's staff. Grybowski scheduled a meeting of the Governor's staff to brief the Governor on "CRMC- deposition of council members (Champlin).

**Argument**

The foregoing affidavits and documentary evidence demonstrate a concerted action by Tikoian, CRMC officials and the Governor's office to thwart Champlin's efforts and deprive it of due process. The conduct of these defendants, including the chairman of a quasi judicial body, acting under color of law, is a violation of plaintiff's rights to due process of law and equal protection of the law. Further, such conduct is a violation of 42 U.S.C. § 1983. See L.A. Ray Realty v Town Council of the Town of Cumberland, 698 A.2d 202, 209 (R.I.1997). (The Court

"is interposed between the state and the people in order to protect the people from unconstitutional actions under color of state law by the Executive [branch]." It is well settled that the Due Process Clause of the United States Constitution "prohibits certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'". Id. at 210.

The foregoing evidence also suggests the existence of other proof of procedural irregularities by CRMC. For example, about what did Lemont brief the Governor? What "massive report" did DEM summarize and provide to the Governor's staff? Who were the "interested parties" that Adelman was talking with?

Champlin's is mindful that the matter before this Court is an appeal from an agency decision. Among its grounds for appeal is plaintiff's contention that Tikoian and Abedon should not have participated in this case because, standing alone, their prejudicial public statements indicate a lack of impartiality such that they are disqualified as a matter of law. This is an objective test—has the judicial officer done or said anything that would lead a reasonable person to conclude that he or she lacks impartiality?

For disqualification to be warranted, actual prejudice need not be proven. The defendant's arguments that disqualifying bias must be based on an external source relates to the usual judicial proceeding in which a party seeks the recusal of a judge because of his or her intemperate behavior *during the course of the proceeding*. The law is clear, the pique of a judge or his or her apparent annoyance or displeasure toward counsel or a litigant is never enough. A judge is not subject to disqualification for his or her judicial behavior during the course of the proceeding. In such a situation, disqualifying bias must emanate from an external source; that is, from something that did not occur in the courtroom. That is not the issue here. When they made their prejudicial statements about Champlin's application and the vote of the subcommittee,

neither Tikoian nor Abedon had presided over any part of this proceeding. They had yet to take their seats. Thus, they do not enjoy the protections of the so-called external source requirement. Their comments were completely gratuitous and sua sponte. However, one does wonder why? Is there an external source? Can Tikoian's collusion with the Governor's office suffice as an external source? What did Lemont do while this proceeding was pending? Does Tikoian have any business interests that may conflict with his impartiality in this case? Let's find out. The plaintiff has expended vast resources in connection with this case. It deserves an opportunity to discover the names of the players and the extent of the collusion.

Finally, Champlin's submits that should this Court conclude that Tikoian and Abedon should not have participated in this proceeding, the remedy is simple and allowed by law. The Court can simply declare their votes void ab initio, and the recommendation of the subcommittee, as reflected in the motion that was voted upon, passes by a vote of 5 to 3. This is the most efficient and just end to this controversy and presents but a singular issue for disposition.

CHAMPLIN'S REALTY ASSOCIATES
By their Attorneys,

By____________________________
Robert D. Goldberg #1733
Goldberg Law Offices
226 Cottage Street, P.O. Box 557
Pawtucket, Rhode Island 02862-0557
Tel: (401) 728-1510

By /s/ Kathleen Managhan
Kathleen Managhan #0355
Houlihan, Managhan & Kyle, LLP
130 Bellevue Avenue, Unit 3
Newport, Rhode Island 02840-7426
Tel: (401) 846-7777

By /s/ Thomas H. DiPrete
Thomas H. DiPrete #4887
2 Stafford Street
Cranston, Rhode Island 02920-4464
Tel: (401) 464-6000

**CERTIFICATION**

I hereby certify that on the 8th day of August 2006 I mailed a true copy of the within *Plaintiff's Evidence of Irregularities before the CRMC* via first class mail, postage pre-paid to the following:

Michael Rubin, Esquire
Special Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903

Brian A. Goldman, Esquire
681 Smith Street
Providence, Rhode Island 02908

Donald J. Packer, Esquire
1220 Kingstown Road
Peace Dale, Rhode Island 02879

Cynthia Giles, Esquire
Conservation Law Foundation
55 Dorrance Street
Providence, Rhode Island 02903

R. Daniel Prentiss, Esquire
One Financial Plaza, Suite 1800
Providence, Rhode Island 02903

Joseph A. Priestly, Jr., Esquire
85 Beach Street
Westerly, Rhode Island 02891

Rida Maria Rocha