UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHAMPLIN'S REALTY ASSOCIATES

VS. C.A. NO.:06-135ML

DONALD L. CARCIERI, Governor of the State of Rhode Island, KENNETH K. McKay IV, Chief of Staff to the Governor of the State of Rhode Island and John Does, 1 through 5

DEPOSITION OF DANNI GOULET, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at Goldberg Law Offices, 226 Cottage Street, Pawtucket, Rhode Island, on July 12, 2006, at 2:00 p.m.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

APPEARANCES:

FOR THE PLAINTIFF: GOLDBERG LAW OFFICES
BY: ROBERT D. GOLDBERG, ESQUIRE
THOMAS H. DiPRETE, ESQUIRE

FOR THE DEFENDANT: STATE OF RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL
BY: BRIAN A. GOLDMAN, ESQUIRE

FOR THE DEFENDANT: SPECIAL COUNSEL
GOVERNOR CARCIERI CLAIRE RICHARDS, ESQUIRE
AND MR. McKAY

ALSO PRESENT: MIKE SCHRAMA, INTERN



I-N-D-E-X

DEPOSITION OF DANNI GOULET


| | PAGE |
|---|---|
| Examination by Mr. Goldberg. . . . . . . . . | 5 |


E-X-H-I-B-I-T-S

| PLAINTIFF'S NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice to Take Deposition | 9 |
| 2 | Newspaper Article | 16 |
| 3 | E-mail dated 11/9/04 | 24 |
| 4 | E-mail dated 11/9/04 | 24 |
| 5 | Photos 1 through 9 plus e-mails | 37 |
| 6 | Article from Projo.com | 53 |



QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 14 | 10 |
| 30 | 5 |
| 30 | 19 |
| 30 | 25 |
| 31 | 21 |
| 32 | 1 |
| 33 | 2 |
| 33 | 6 |
| 33 | 10 |
| 33 | 15 |
| 45 | 4 |
| 45 | 8 |
| 52 | 21 |
| 54 | 22 |
| 55 | 2 |
| 55 | 25 |
| 60 | 20 |
| 67 | 15 |
| 67 | 18 |
| 67 | 21 |
| 68 | 3 |
| 68 | 14 |



(DEPOSITION COMMENCED AT 2:24 P.M.)

DANNI GOULET,

having first been duly sworn by the Notary Public, testified as follows:

THE COURT REPORTER: Please state your full name and spell it for the record.

THE WITNESS: Danni Goulet (D-a-n-n-i) (G-o-u-l-e-t).

EXAMINATION BY MR. GOLDBERG:

Q. Mr. Goulet, have you ever had your deposition taken before --
A. Yes, sir.
Q. -- in a federal proceeding?
A. No.
Q. Okay. And you indicated, yes, meaning state court?
A. Yes.
Q. Okay. And how many times in a state court proceeding?
A. Twice.
Q. How long ago was that?
A. Once was about six months ago and the other one was several years ago.
Q. Okay. And have you ever been a party to a lawsuit personally?

A. No.
Q. And you are here being represented by Mr. Goldman today?
A. Yes.
Q. And is he representing you in your personal capacity?
MR. GOLDMAN: I'm representing him as an employee of the agency.
Q. Okay. Do you have anybody representing you in your personal capacity?
A. No.
Q. Do you want anybody to represent you in your personal capacity?
A. Not at this time.
Q. Okay. Now, you understand that this is a deposition taken under the power and authority of the United States District Court and you are under the same oath today that you would be if Judge Lisi, the presiding justice, were sitting here today?
A. I do know, yes.
Q. Okay. And you realize that in the federal court it's much more formal and strict than at a Coastal hearing. Are you aware of that? The rules are enforced to the letter and there are very formal



proceedings over there. Do you understand that?
A. I do.
Q. Okay. I bring that to your attention because I assume you've testified many times before the administrative agency of CRMC; correct?
A. Yes, I have.
Q. Now, if at any time you do not understand a question that I put to you, please make that known to me, because everybody is going to assume that by answering the question you understood the question. Would you please make it known to me if you don't understand a question?
A. I will.
Q. Okay. And you understand that should you deliberately give any incorrect answers, you're going to be held personally accountable for that?
A. I do.
Q. Okay. Has anybody ever explained to you the Whistleblowers Act?
A. No.
Q. Have you ever heard of it?
A. I've heard of it.
Q. And what's your understanding of it?
A. It is protection for employees who notify somebody -- notify authorities of any wrongdoing.



Q. By their employers?
A. By their employers, yes, sir.
Q. And you understand that, if need be, you could potentially come within the protection of that Act?
A. I didn't, but I do now.
Q. Okay. You understand that if during the course of this deposition something occurs to you where you would like to correct or reform a prior answer that you have given, that I will give you the opportunity to do that?
A. Okay.
Q. And if you feel it necessary to do that at any time, will you make that known to me?
A. I will.
Q. Now, you were served with a subpoena to be here today; correct?
A. Yes, I was.
Q. And is this a fair and accurate copy of the subpoena with which you were served?
A. Yes.
MR. GOLDBERG: Okay. If there be no objection, I would mark the notice to take deposition and the subpoena as one exhibit. Is that fine?



MS. RICHARDS: No objection.
(Plaintiff's Exhibit 1 marked for ID.)
MR. GOLDMAN: At the appropriate time when we get into the subpoena, I do have a matter I need to make on the record, which I have previously notified Mr. Goldberg about, about what documents could or could not be produced in the areas of inquiry. I can do that now if you want, I can wait until you get into what he's brought with him in the subpoena.
MR. GOLDBERG: I'll give you an opportunity momentarily to do that.
MR. GOLDMAN: Okay.
Q. Now, the subpoena, as you pointed out to us at the start of the deposition was in the wrong name. Your name is not Daniel, it's Danni?
A. That is correct.
Q. Okay. And what's your home address?
(Witness conferred with Mr. Goldman.)
A. 111 Grant Street, Attleboro.
Q. Massachusetts?
A. Yes.
MR. GOLDBERG: And under the current rules of procedure in the court, in my opinion -- and obviously I am not directing you as your

counsel -- you're not allowed to ask for assistance from Mr. Goldman in answering a question. If you don't understand it, let that be known.

THE WITNESS: Okay.

Q. Now, you were requested, or in the language of a federal subpoena, you were commanded to produce and permit inspection and copying of documents listed in Exhibit A. Did you do that? Did you bring the documents requested in the attachment to your subpoena?

A. I brought the documents for attachment A for number 1, yes.

MR. GOLDMAN: At this point, it's appropriate for me to put my objection on the record. As I have previously notified Mr. Goldberg in a phone call, I have -- and the agency has no objection to Mr. Goulet producing any plans, maps, drawings, designs or proposals submitted to the Office of the Governor.

Any other plans, maps, drawings, designs or proposals to the extent they exist, which were used by the CRMC staff or the CRMC council members in aiding them in forming their opinions, recommendations, or that were part of their



deliberations on the Champlin's application are covered by the deliberative process privilege and I am so invoking that.

Any and all notes, memoranda, records of any and all conversations, communications, meetings or actual conversations between Mr. Goulet and any CRMC members are covered by the deliberative process privilege and I am so invoking that.

Mr. Goulet has produced the maps, drawings, designs, proposals, whatever was submitted to the caucus of the Governor, I've advised Mr. Goldberg of that. I asked him -- or we conferred as to whether or not I should just file a motion for a protective order prior to this deposition.

We agreed that we would go forward; he would ask his questions and to the extent I feel that it gets into the deliberative process privilege, I will invoke my right under the rules and terminate the deposition and file the appropriate memo.

To the extent you want to inquire about what Mr. Goulet presented to the Office of the Governor, I think that you're entitled to that. But, if you intend to get into any communications between Mr. Goulet and any CRMC members, I will then terminate the deposition pursuant to the



rules.

MR. GOLDBERG: Certainly I do intend to get into those areas that you mentioned and I question this so-called deliberative process privilege in any application it may or may not have to this witness. However, I do intend to proceed with the deposition and I'm not seeking to convince you of anything, Mr. Goldman. I'm just putting a few comments on the record for clarity purposes.

I do believe the better way to proceed is to have a question or a request pending and then should you seek to advise the witness not to answer based on privilege and you set forth the privilege, then that question would be obviously held in abeyance till we can get a ruling from the court as to how to proceed.

I don't believe it's appropriate to stop the deposition from any and all questions because there's a privilege claim to one or two questions. Having said that, I think I'm also entitled to a privilege log of what documents were produced -- excuse me, which were prepared and not produced in response to the request for production of the subpoena for production.



That privilege log, as you're aware, is to include a description of the document and the basis for claiming the privilege. Just merely to produce what you want and say the rest of the documents are privileged does not meet the spirit or intent of the rules.

Q. Having said that, Mr. Goulet, what did you bring with you in response to Subpoena Exhibit A-1?

A. I have the presentation that was presented to the Governor. I also have -- on that presentation there are letters marked 1 through 9, that was the presentation. Portions of this presentation marked 1 through 5 were e-mailed to Mark Adelman of the Office of the Governor, and this is the e-mail.

Q. Okay. Let me run through this with you again, if I could.

A. Yeah.

Q. In the upper right-hand corner of the documents you have a numbering sequence. In the lower left-hand corner, you have a numbering sequence?

A. Correct.

Q. What is the distinction between the two corners?

A. The lower left corner is the number and sequence of the presentation. This is a printout

of the PowerPoint that was given to the Governor's office.

Q. The lower left?

A. The lower left, yeah.

Q. And the upper right?

A. The upper right corresponds to the e-mails that were sent to Mark Adelman where it will say 1 of 5, 2 of 5, and so forth. This would be the 1 of 5.

Q. Okay. Now, are there other plans, maps, drawings, designs or proposals, other than those marked as exhibits in the hearing process for Champlin's Marina, including but not limited to any and all plans submitted to the Office of the Governor of the State of Rhode Island, which you have not produced here today; and I think that's a yes or no --

MR. GOLDMAN: Objection. I am informing the witness not to answer that question based upon the deliberative process privilege.

MR. GOLDBERG: Okay. You're directing him not to tell me if any other plans even exist?

MR. GOLDMAN: That's correct.

Q. Okay. Now, request number 2 in Exhibit A called for any and all notes, memoranda, records of any



and all conversations, communications, meetings had by Mr. Goulet with any person, firm, corporation or governmental entity concerning Champlin's Marina, including but not limited to Michael Tikoian, Paul Lemont, representatives of the Town of New Shoreham or any other objectors to the Champlin's proposal and/or any member of the staff of the Office of the Governor of the State of Rhode Island and/or the Governor of the State of Rhode Island. Did you bring any documents in response to that request?

MR. GOLDMAN: I'm going to put in an objection. He can answer that, obviously, but subject to what I said is that he was instructed not to bring any notes, memoranda, records, or any records of any conversations, communications to the extent they exist between Michael Tikoian and CRMC member, Paul Lemont. Everything else was produced.

MR. GOLDBERG: Are you claiming the privilege on behalf of the agency?

MR. GOLDMAN: It is on behalf of the agency and its members.

MR. GOLDBERG: Are you aware that members of the agency have specifically waived any



privileges and the other members of the agencies have spoken freely to the press and thereby waived any potential privileges as well. Are you aware of that?

MR. GOLDMAN: I'm not answering your questions but I know that one member, Mr. Zarrella, has indicated that he wishes to testify in the administrative process in Superior Court. No other member has indicated such a willingness nor has any privilege been waived and I'll leave it at that.

MR. GOLDBERG: I would also add here that the witness himself has a right to testify, should he choose to do so; notwithstanding any other claims that you may have. However -- also, I'd like to point out -- if we could mark this for the record.

(Plaintiff's Exhibit 2 marked for ID.)

MR. GOLDMAN: I don't know -- I'm not a party to litigation so I don't know that I can object to you putting something in.

MR. GOLDBERG: Correct.

Now, it has been recorded that members Zarrella, Tikoian -- excuse me, Zarrella, Ricci and Sahagian have spoken to the press as set forth



in Plaintiff's Number 2 for this deposition. I would suggest to you that Mr. Tikoian recounts in the same article that he has done mailings to people regarding these instances. I would suggest in the very first instance that that activity recorded in this article constitutes a waiver of any so-called claimed privilege.

Secondly, it should be the witness's, or is the witness's option to testify if he so chooses and he is not bound by any direction or instruction from counsel for his employer, Coastal.

Mr. Goulet, do you wish to answer any of these questions?

THE WITNESS: I don't understand what you're asking me. Can you say it from the beginning?

MR. GOLDBERG: Yes. Mr. Goldman has indicated that he's directing you not to answer questions based on the claim of the agency privilege. I'm suggesting to you that it is your right to still answer the questions if you so choose. Do you wish to answer the questions notwithstanding his objections?

MR. GOLDMAN: I am just going to object to

that characterization. I do not believe it is his privilege to waive. So, I'll put that on the record as well.

THE WITNESS: At this time, I do not.

MR. GOLDBERG: You do not wish to testify?

THE WITNESS: Correct.

Q. Okay. Now, what, if anything, did you bring in response to request number 2? I asked you that a moment ago and I frankly lost track of the answer. Would it be fair to say nothing?

A. That is correct.

MR. GOLDMAN: Could we go off the record for one second.

(Discussion was held off the record.)

MR. GOLDMAN: We can go back on.

Q. BY MR. GOLDBERG: Now, you have been employed at Coastal Resources Management what, four years now?

A. Yes. Approximately that.

Q. Okay. And, how is it that you acquired this employment? How did you get the job?

A. I applied for it.

Q. Okay. And did anybody in particular recommend you?

A. Not that I'm aware of.

Q. Prior to having this job, did you know Mr.



Tikoian?

A. No, I did not.

Q. Did you know Mr. Lemont?

A. No, I did not.

Q. Did you know anybody associated with Coastal?

A. No, I did not.

Q. Well, you had dealt with Coastal in your prior career, hadn't you?

A. Yes. I did not do much work in Rhode Island prior to coming to Coastal but I had done work. I had submitted permit applications to the agency.

Q. And who did you deal with at the agency on those permit applications?

A. Tom Mederos (phonetic) was the person I dealt with.

Q. Anybody else?

A. I think it would have been Tracy Silva as well.

Q. Anybody else?

A. No.

Q. Now, do you know whether you're an at-will employee or whether you have protections under the Rhode Island Civil Service Act?

A. I do not know.

Q. And what's your specific job title at present?



A. Dredging coordinator.

Q. Now, is it fair to say that there are at least two classifications or classes of jobs over there? Some people are policy staff and some people are permit staff. Is that fair to say?

A. That is fair to say.

Q. And which category, if either, do you fall into?

A. As always, there's the exception to the rule and I operate in both of the departments.

Q. Okay. And who's your immediate supervisor?

A. Mr. Fugate.

Q. And are you the only employee that operates in both of the departments?

A. No.

Q. How many others do?

A. There are two others.

Q. And who are they?

A. They would be David Alves and Janet Freedman.

Q. And what are their basic jobs?

A. David Alves is the aquaculture coordinator and Janet Freedman is the Coastal geologist.

Q. And you are the dredging coordinator; correct?

A. Correct.

Q. What does that job require you to do?

A. To coordinate dredging activities for the



state and develop policy for the state in regards to dredging.

Q. So, if I understand you correctly, on applications for dredging, whether in the application process or prior -- excuse me, subsequent after approval, you would work with the people and supervise or monitor the dredging?

A. I would not supervise the dredging, I would monitor it, yes.

Q. Did your monitoring of dredging include the dredging of the commercial channel in Narragansett Bay?

A. The Providence River project?

Q. Yes.

A. Yes, it did.

Q. And did you go out to that scene with the Governor and review the progress at one point?

A. Yes, I did.

Q. Okay. And Mr. Lemont also went that day too, didn't he?

A. I believe he did.

Q. Okay. And Mr. Lemont was directed to, on that day, to update the Governor on the Champlin's project, wasn't he?

MR. GOLDMAN: Objection. I'm going to

assert the deliberative process privilege.
MR. GOLDBERG: I would specifically indicate that that privilege has been waived. I've received correspondence from Mr. Tikoian indicating exactly what I suggested in the question and that it's out there and it absolutely is a waiver of any claim or privilege on that.
MR. GOLDMAN: I'm asserting privilege.
Q. Okay. Now, were you present when Mr. Lemont briefed the Governor on that trip on the Champlins's project?
MR. GOLDMAN: Again, I mean, if you're going to go down this road, I'm just going to terminate it. The focus of the subpoena was the presentation made by Mr. Goulet to the Governor. Why don't you go into that and then I'll move to terminate. Otherwise, I mean --
MR. GOLDBERG: I have many, many areas of inquiry for the witness. It's my discretion as to the areas of -- the sequence of the areas I choose to go into. If you are going to terminate the deposition at this stage, certainly there's nothing I can do about it if you direct the witness to leave now and you, yourself, leave, other than file a motion and seek appropriate



remedies.
MR. GOLDMAN: I will let you go a little further but, as I said to you, if we're going to get into the areas of deliberative process then I will need to invoke my right under the rules.
MR. GOLDBERG: I'm going to ask my questions. What you do in response to them, I cannot control, but I am not going to withhold questions on the threat that you're going to invoke the privilege and leave. I still have the right to ask the questions.
MR. GOLDMAN: Well, I have a right, so we're clear, to seek a protective order. I discussed that with you, that I was contemplating seeking a protective order. We agreed we would start the deposition and that if we got into the area of the privilege then I would invoke the right to seek the privilege.
MS. RICHARDS: Is this the e-mail I sent you a better copy of?
MR. GOLDBERG: Yeah, it is. I will give you a better copy before we leave.
MS. RICHARDS: Okay.
MR. GOLDMAN: I can't read this. Do you have a better copy of it?



MR. GOLDBERG: Yeah, if I can find it. Can we mark the copy that Mr. Goldman --
(Plaintiff's Exhibit 3 marked for ID.)
MR. GOLDBERG: And then we will mark the best copy I have today as the next exhibit.
(Plaintiff's Exhibit 4 marked for ID.)
MR. GOLDMAN: What was the last -- I forgot what the last question was.
(Question read back.)
MR. GOLDMAN: I suppose he can answer if he knows the answer to it. I withdraw my objection on that.
THE WITNESS: Could you just tell me what the last question was?
MR. GOLDBERG: I'll rephrase the question.
Q. Now, I asked you, prior to the discussion among counsel, whether or not you were present when the Governor went out to visit the Providence River dredge, and you indicated to me that you were present; is that correct?
A. That is correct.
Q. And you indicated that Mr. Lemont was also present?
A. That is correct.
Q. And what was the approximate date of that event?



A. I have no idea. I did a tremendous number of trips for people out to see the dredge. So, I don't recall.
Q. How many did the Governor go on?
A. Only one, I believe.
Q. How many did Mr. Lemont go on?
A. At least two that I can recall.
Q. And when approximately were they?
A. I'm sorry, I don't recall the dates on the trips.
Q. Would it have been before November 9th of '04?
A. Again, I can't be certain.
Q. Okay. I'll show you at this point Plaintiff's Exhibit Number 4.
A. The legible or illegible?
Q. You tell me. The last question I had prior to showing you Plaintiff's Number 4 was whether or not the trips with Mr. Lemont to the Providence River dredge project were before November 9th of '04. As you can see, that is the date of the exhibit at the top. Does that refresh your recollection?
A. No, sir, it does not.
Q. Okay. So, did you discuss the Champlin's application with the Governor on this dredging

occasion when he was out there?
A. No, I did not.
Q. Would it be fair to say that you were not even involved in the Champlin's application at that time?
A. That would be correct.
Q. When did you first become involved in the Champlin's application?
A. At the end of the testimony when the record was complete. I am not sure of the -- what that date was. Excuse me, I had one prior portion dealing with the dredging, as you are aware, the dredging portion of the review.
Q. Well, just for purposes of the record and to refresh your recollection, my records indicate that you did, in fact, testify in the contested hearing on July 7th, 2005, 6:00, at South Kingstown Town Hall. Does that refresh your recollection?
A. Yes. That would be for the dredging portion of it, yes, I did that.
Q. And what did you do to prepare for that testimony?
A. For that testimony I reviewed the -- I did one small portion reviewing the applicant's dredging information, soundings, as part of the --



determining whether or not it was reasonable or not to dredge and if the cost estimates were reasonable or not.
Q. Who asked you to do that?
A. It was either Mr. Anderson or Mr. Fugate as part of the review of the application.
Q. Prior to giving that testimony, isn't it true that you did have a discussion with Mr. Prentiss?
A. I don't recall.
Q. You don't recall one way or another?
A. No, I don't.
Q. You don't recall Mr. Prentiss saying he was asked to analyze the dredging analysis in the dredging cost estimate? Do you recall Mr. Prentiss saying that about you?
A. During the --
Q. Yeah.
A. I guess I don't understand what you're asking me.
Q. Well, do you recall Mr. Prentiss said that during the hearing, indicating what you were asked to do?
A. Specifically, no, I do not.
Q. Okay. But does that refresh your recollection in any way as to whether or not you had spoken to Mr. Prentiss prior to giving your testimony?



A. No, it does not.
Q. Okay. Now, who asked you to get involved in this project?
A. The dredging portion of it?
Q. No, the design of plans and alternatives. Who asked you to do that?
A. Mr. Fugate directed me.
Q. Okay. When did he do that?
A. At the conclusion of all of the testimony.
Q. Did you consult with any other staff members in your preparation of your alternative plans?
A. No, I did not.
Q. Did you make any of the other staff members aware of the fact that you were doing alternative plans?
A. I believe some staff members knew, as I was using our computer lab which is a public --
Q. Public place?
A. Or staff place, yes.
Q. And who else knew of the plans that you were doing?
A. I can't speculate on who knew. I mean, you could come in and out at will.
Q. Now, you showed these plans to Mr. Tikoian; correct?
A. Yes.



Q. Okay. And you showed them to Mr. Lemont?
A. Yes.
Q. Okay. And you showed them to the Governor?
A. Yes.
Q. Okay. And you went to a meeting at the Governor's office?
A. Yes, I did.
Q. And who was present at that meeting?
A. I believe -- well, it was myself, Mr. Fugate, Mr. Tikoian, the Governor. It believe it was Mark Adelman and Jeff Grybowski.
Q. When did you design these plans?
A. After the — there are various time frames in here. Things that came from the record were done at the close of the evidence and before the workshop.
Q. The subcommittee workshop?
A. Correct.
Q. And then you did other plans after the subcommittee workshop; is that what you're implying?
A. Yes.
Q. And did you show these plans, the ones you did prior to the subcommittee workshop to anybody? Did you show them to anybody?

A. Yes, we already --
Q. Who did you show them to?
A. We saw the ones that were done prior, we saw them at the subcommittee. You saw them.
Q. I'm sorry, let me clear up my question. Prior to the subcommittee workshop, did you show these plans to anybody?
MR. GOLDMAN: I'm going to object on the deliberative process privilege to the extent you're going to try and ask if he showed these plans to any CRMC member.
Q. Did you show them to anybody?
A. Yes.
Q. Did you show them to counsel for any of the parties prior to the subcommittee meeting?
A. No, I don't think so.
Q. Why not?
A. I'm sorry, I don't understand.
Q. Why didn't you show them to counsel for either side prior to pulling them out at the subcommittee meeting?
MR. GOLDMAN: I'm going to object and order him not to answer. That goes to the deliberative process privilege.
Q. You were, in fact, directed not to show them to



counsel; isn't that true?
A. (Witness nods in the affirmative.)
MR. GOLDMAN: Same objection. I instruct him not to answer.
MR. GOLDBERG: The witness seems to be nodding his head in the affirmative. I'd just like to --
Q. Is that a correct observation?
A. That is an incorrect observation.
Q. Okay. Yes, you were nodding in the affirmative --
A. Yeah, okay. All right.
Q. -- in response to my last question.
MR. GOLDMAN: Well, let's clarify that. Why don't we find out whether the witness's head was just moving or whether he was giving you an affirmative answer.
(Question read back as requested.)
MR. GOLDBERG: If they want to dispute your taking of this deposition, that's up to them to do so.
Q. Now, in fact, you showed these plans prior to the subcommittee meeting to selective members of the subcommittee; correct?
MR. GOLDMAN: Objection. Same objection. I instruct him not to answer.



Q. Now, where did you get the figure of 100-foot seaward expansion from?
MR. GOLDMAN: Objection. Same deliberative process.
Q. What prompted -- strike that. Had you ever gotten involved in the project after it was completely over and then done plans of this nature before?
A. I don't understand what you're asking me.
Q. Now, this case, you indicated that other than one brief appearance for testimony, you did not participate in the hearings; correct?
A. That is correct.
Q. You did not go to the hearings?
A. That is correct.
Q. Other staff members on CRMC had been there for every single hearing?
A. I assume so, yes.
Q. And they would be Mr. Anderson and Ms. Silva?
A. Uh-hum.
Q. Is that a yes?
A. I believe so. I don't know if they attended every one.
Q. Okay. And do you know them to be competent in their field of expertise?
A. Yes, I believe they're competent in their



field.
Q. Is there a reason you did not consult with them in your drawing of the plans?
MR. GOLDMAN: Objection. I instruct him not to answer.
Q. Now, you were told by Mr. Tikoian to construct 100-foot plan; isn't that correct?
MR. GOLDMAN: Objection. Instruct not to answer.
Q. And you discussed these plans that you prepared with both Mr. Tikoian and Mr. Lemont; isn't that correct?
MR. GOLDMAN: Objection. Instruct not to answer.
Q. And you showed these plan to Mr. Sahagian; isn't that correct?
MR. GOLDMAN: Objection. Instruct not to answer. If we're going to go down this road about the council members, I'm just going to move for protective order on this. This whole line of questioning about council members -- any discussions he had with council members regarding these plans, I'm going to object to under the deliberative process privilege. Is it your intent to keep asking questions on this?

MR. GOLDBERG: I have questions on many, many numerous and diverse areas. I think the proper procedure is to put as many questions as possible for the court to review and rule on specific questions rather than stopping at a few questions, coming back, and then being faced with the same objection and having to go back to court again.

MR. GOLDMAN: What I'm saying to you though is, if you want to move onto another area that does not involve any discussion, deliberations, recommendations, advisory opinions that he may have given or may not have given to council members, why don't we move to that area. Otherwise, if you're just going to ask the same question the same way then this is a waste of everybody's time, and let me just go file my motion for protective order and then we can move onto the other areas that you want.

Q. Now, you were present at the vote of the subcommittee correct?

A. Yes, I was.

Q. And I believe that you referred to that as the "subcommittee workshop," that meeting?

A. Yes.



Q. Okay. And you had prepared many more slides and plans than you have brought here today for presentation at the subcommittee workshop; isn't that true?

A. That is incorrect.

Q. Okay. Are these plans the only ones that were prepared at the time of the subcommittee workshop?

A. No.

Q. Okay. Had you done others?

A. No.

Q. And you had done these plans which were marked, the ones you brought with you today?

A. Yes.

Q. But there are others who had prepared other plans?

A. No. Let me help you, Mr. Goldberg.

Q. Go right ahead.

A. I didn't have the subcommittee recommendation which is in here or in here.

Q. Okay. Well, let's take this opportunity to mark these and then we'll clarify a few things. These color copies that you have brought with you today, you have more copies of these?

A. I have these copies. This is the printout of a PowerPoint presentation.

Q. These documents that I am holding in my hand, you



indicated you were producing in response to the subpoena?

A. Yes.

Q. Okay. And is this the only set of those documents that you have?

A. I guess I don't understand what you're asking me. It's a computer file. So, we can print out 1,000 of them.

MR. GOLDBERG: Okay. Then I will mark these originals as -- I'm calling them originals because it's what you've handed me in response to the request as the next exhibit and designate it as those documents produced in the response to the request for subpoena.

Q. You will also have additional copies of these same ones; correct?

A. These are additional copies of what you have, yes.

Q. And these are identical?

A. Yes, they are.

MR. GOLDBERG: We'll mark these 5.

MR. GOLDMAN: Do you want to mark them 5A through --

MR. GOLDBERG: Well, they have numbers on them.



(Plaintiff's Exhibit 5 marked for ID.)

Q. Now, did you draw up -- I think you've testified to this already today and I want to be clear. You drew up further plans after the subcommittee meeting?

A. I drew up a plan after the subcommittee meeting.

Q. And what did you do with that plan?

A. I provided it to you. This one is the subcommittee recommendation.

Q. This is 5/4 or 5/6. You prepared 5/6 after the subcommittee meeting; correct?

A. That is correct.

Q. Subcommittee workshop. And you also brought this plan to the Governor's office?

A. That is correct.

Q. Okay. Now, other than this 5/6, did you prepare any other plans after the subcommittee workshop?

A. No, I did not.

Q. Okay. And what was the purpose of bringing these plans to the Governor's office?

A. To provide an overview of the Champlin's project.

Q. Okay. And how was that meeting arranged?

A. I was told by Mr. Fugate to go to this meeting

and --
Q. Meeting with the Governor?
A. Correct.
Q. And who was the chairman of the meeting, if you understand my question. Who ran the meeting?
A. The Governor -- I'm really not -- I guess there was no facilitator at the meeting.
Q. Mr. Tikoian was there?
A. That is correct.
Q. Where did the meeting take place?
A. At the State House.
Q. Okay. And what room, if you could describe it for me.
A. It's on the first floor, if you walk in, to the far right.
Q. Far right?
A. Yeah. The Governor's conference room, I suppose.
Q. On the first floor, the policy conference room or policy office?
A. It was my first and only time there. So, I'm not sure if that's the correct place.
Q. Very end of a corridor?
A. I don't think it was the very end but it was close.



Q. Okay. And then at the meeting there was from Coastal, yourself; correct?
A. That's correct.
Q. Mr. Tikoian?
A. That is correct.
Q. Mr. Fugate?
A. That is correct.
Q. Those are the only people from Coastal there?
A. Yes.
Q. And did you all three go to the meeting together?
A. Yes.
Q. Where did you three meet up?
A. At Mr. Tikoian's office.
Q. Okay. In Providence?
A. In Providence.
Q. His accounting office?
A. His accounting office.
Q. How many times have you been to his accounting office in the past?
A. A fair number of times because that's where we have policy and planning meetings.
Q. Okay. And policy and planning meetings of Coastal?
A. Correct.
Q. About how many such meeting have you attended at



his accounting office?
A. A round number is probably ten. I don't keep track of them.
Q. Do you recognize the telephone number 640-8719?
A. No.
Q. You don't?
A. No.
Q. Okay. How long did the meeting last with the Governor?
A. About a half hour, maybe a little bit longer.
Q. It was scheduled for a full hour, are you aware of that?
A. No, I was not.
Q. But you're saying it didn't take the full hour?
A. No.
Q. Was there any time during the meeting where you were asked to leave the room?
A. During the meeting?
Q. Yes.
A. No.
Q. Were you asked to leave the room earlier than it ended or to not come in until after it had started?
A. No.
Q. So, you were there for the entire meeting?



A. Correct.
Q. When were you first told of the meeting?
A. The meeting was on a Friday. It was earlier that week. It could have been a Monday or Tuesday. It was somewhere around there.
Q. And the meeting was the Friday immediately following the subcommittee workshop; correct?
A. Yes.
Q. That would have been the meeting of October 28th, 2005?
A. Yes.
Q. Okay. And tell me everything you can remember that was said during the course of that meeting?
A. Can I use these?
Q. Whatever it takes.
A. My purpose was to give the Governor an overview. So I explained to him what Champlin's -- what the existing facility looks like, what the existing permits are, the existing permitted Army Corp. mooring field, some of the distances from the facility to that mooring field, some of the distances from the largest vessel that call on Champlin's. Then I gave him -- let him view a photo submitted by the applicant.
MR. GOLDMAN: Do you want to just

reference -- just so the record is clear.
THE WITNESS: Would you like me to do that?
MR. GOLDBERG: I want the witness to answer as he sees fit.
THE WITNESS: Okay.
A. That was on slide number 1 that I explained -- this was a picture during the summertime when the facility was under most use. They happened to have the large vessel there. Then I went on to -- this was from the applicant's application. This was what was requested in terms of expansion and, again, there's the distances from the proposal as well as the overlaying of the large 165-foot vessel that calls on the facility.
I also outlined the marina perimeter that was requested as part of that application. Then I discussed the water depth in there and that the survey done by the applicant and the Land Trust were very similar. Both showed two rocks. The Land Trust just happened to be a bit easier to read, which is why they're included in here. Then this was a blowup of it. It detailed the water depths in and around the facility.
Then I explained the subcommittee



recommendation of what they recommended as far as 170-foot expansion seaward for structures. The ability to have vessels 25 feet on the outboard side of the vessels but no further than that and what that was in relation to the permitting mooring field.
Then I overlaid that same subcommittee recommendation to the best I could. This is a not-to-scale photo. So, it is just trying to roughly get 5 feet outside of the large vessel, put the mooring field on and showed some of the moorings that are impacted by the mooring field lines.
I also showed him the closest dredge material disposal site to Champlin's. Then I showed some alternatives -- an alternative to the expansion that would meet the goals of the 165-foot vessels being able to service them, as well as have some expansion, as well as maintaining some navigation through there.
Then I also explained that there were some issues with the mooring field that had to be corrected as part of the town as well.
Q. My question was to tell me everything that was said during the course of the meeting. Now you've



just run through apparently what you said during the meeting. What did other people say that you recall?
A. The -- I gave a presentation very similar to what I just gave you. There were -- I don't recall any questions. They tend to be -- they were minor in asking for clarification of items but that was it. It was more of a monologue than a dialogue.
Q. What did the governor say during the meeting?
A. Not much that I can recall.
Q. What did Mr. Tikoian say?
A. I don't believe he said anything, but nothing that I can recall.
Q. You don't recall anything he said during the meeting?
A. It was basically me presenting this. It was a PowerPoint not a -- it was on a screen as opposed to on the plans.
Q. Did you make notes of the meeting anywhere?
A. No, I did not, I was speaking.
Q. I mean, after you left?
A. No, I did not.
Q. Now, this was the first time in your career and only time in your career at Coastal where you were



asked to go to the Governor's office with the chairman?
A. Correct.
Q. Okay. And what discussion did you have with the chairman before the meeting?
MR. GOLDMAN: Objection. Same deliberative process privilege.
Q. And did the chairman tell you what to say and what not to say during the course of the meeting?
MR. GOLDMAN: Objection. Same objection.
MR. GOLDBERG: Are you directing him not to answer?
MR. GOLDMAN: I'm directing him not to answer.
Q. Isn't it true that the meeting was set up at the request of -- strike that. At who's request was the meeting set up?
A. I'm not sure. I was just told to attend.
Q. Now, just in passing, let me ask you, why did you use different configurations for the existing marina in these various plans?
A. I'm sorry, I don't understand.
Q. Why did you use different configurations for the existing marina in these various plans?
A. I heard it the first time and I still don't

understand what you're asking me.
Q. Well, let me just, for example, show you -- your number 1 --
A. Yeah.
Q. -- shows a particular configuration of the existing marina.
A. Yeah.
Q. Okay. And then we go to your number 2 and it's a completely different configuration for the existing marina; isn't that correct?
A. Uh-hum, yes.
Q. And why did you not then use the same configuration for the existing marina in all of your presentations?
A. This was from?
Q. Number 1.
A. Number 1 was from the record. So, that's why I used this photograph.
Q. Well, wasn't number 2 from the record?
A. Yes. But it's not an aerial photo.
Q. Weren't there other photos of the existing marina in the record?
A. Not ortho (phonetic) photos.
Q. You're saying those are the only exhibits of the existing marina?



A. These are the existing exhibits that we had available in digital form that I could prepare overlays on.
Q. Did you tell the Governor that these were not accurate depictions of the existing marina?
A. The perimeter is exiting --
Q. I didn't ask you about the perimeter. I just asked about the existing marina in toto.
A. The -- what you're asking me -- I guess I don't understand the question because I believe it to be misleading.
Q. Did you see anybody in the meeting take notes?
A. I believe the Governor's staff people took notes.
Q. Would that be Mr. Grybowski?
A. Yes. I think both of the governor's staff people were taking notes.
Q. And that would be who?
A. I think Mr. Adelman was at the meeting and Mr. Grybowski.
Q. Was Mr. McKay there?
A. I'm not sure. I don't know who Mr. McKay is. I believe it was the first time I met these people.
Q. Okay. Were the issues concerning the marina



discussed in that meeting?
A. I don't understand what you're asking me.
Q. Well, did anybody discuss in that meeting the pros and cons of the proposal?
A. Other than the presentation that I gave you and sort of outlying the impacts to various items, that's what was discussed at the meeting while I was there.
Q. So, you're telling me that there was no other discussion at the meeting as to the benefits of the proposal as opposed to the potential detriments?
A. The presentation that I gave, I didn't have any opinion one way or the other. I presented what was in the record.
Q. You didn't have an opinion one way or the other?
A. I was asked to present what was in the record.
Q. Do you know why you were asked to do it and not a member who had sat through all the hearings?
A. No, I do not.
Q. Did you make any inquiry ever to anybody in that regard?
A. No, I did not.
Q. Okay. Didn't it seem odd to you?
A. No.



Q. Even though you had never done it before?
A. Never done what before?
Q. Going to see the Governor and explain a project that you were not involved in throughout its time at Coastal?
A. In preparation of this I reviewed the entire record of all -- however many volumes there were. So, I was able to review the record without having gone through all of the iterations that are normal in the permitting process.
Q. Isn't it true that at that meeting Mr. Tikoian was speaking against the applicant's proposal?
A. I don't believe that was happening at any time when I was in the room.
Q. But you were in the room for the whole meeting?
A. Correct.
Q. Okay. Isn't it true that Mr. Tikoian told the Governor that he preferred a much smaller expansion than was proposed?
A. Again, I was not there. If he did that, I was not there.
Q. Isn't it true that at that meeting Mr. Tikoian told the Governor that he supported the 100-foot proposal as did Mr. Lemont?
A. Not while I was there.

Q. And isn't true that there was discussion at that meeting about the town wanting to expand its mooring field?
A. In one of the slides I discussed the town's mooring field and the fact that they can't achieve their authorized number in the area that they have.
Q. And what did other people in the room say about that?
A. During my presentation there was nothing.
Q. How about after your presentation ended?
A. I left.
Q. Immediately?
A. As soon as I cleaned everything up, yes, sir.
Q. And did everybody else leave?
A. Mr. Fugate and I left.
Q. Okay. Mr. Tikoian stayed?
A. Yes.
Q. And he stayed in the room with the Governor and his staff?
A. I don't know.
Q. Okay. But he stayed in the room and you left the room?
A. Correct.
Q. Why did you leave the room before Mr. Tikoian



left?
A. I was asked to give a presentation and that's what I did and then we were to leave.
Q. Now, earlier -- "we were to leave," who said you were to leave?
A. That's all -- I guess the Governor said thank you at the conclusion of our presentation and we packed up and left.
Q. He excused you and Mr. Fugate and Mr. Tikoian stayed, is that what happened?
A. Yes.
Q. Okay. And you and Mr. Fugate waited outside for Mr. Tikoian?
A. No.
Q. Well, weren't you all in the same car?
A. It's a short walk.
Q. From where to where?
A. From the State House to where the cars were parked at Mr. Tikoian's office.
Q. And where is his office?
A. On Weybosset Street.
Q. Okay. So you and Mr. Fugate left Mr. Tikoian there?
A. Correct.
Q. With the Governor and his staff?



A. Yes.
Q. Now, I thought I asked you some time ago whether or not you were there for the entire meeting and whether any of it took place before you got there or after you left the room, and you told me no, that you were there for the entire meeting.
A. I believe you asked me if any of the meeting happened beforehand. I don't recall you asking me if anything happened after.
Q. Would you like that read back or would you like to clarify that point right now?
A. Well, we can clarify that is the case, that I gave the presentation and that's my extent of the meeting. Mr. Tikoian remained, I don't know how long.
Q. But you know for a fact he did remain?
A. He was in the room when Mr. Fugate and I left.
Q. Okay. And when you left the building, he was still on the scene?
A. Yes.
Q. And it was, in fact, Mr. Tikoian that told you to draw up plans for a lesser expansion; isn't that true?
MR. GOLDMAN: Objection. I instruct him not to answer, deliberative process privilege.



Q. Now, isn't it true that Mr. Tikoian clearly indicated to the Governor and his staff, in your presence, that he was against the Champlin's proposal? And I -- just to refresh your recollection would remind you that his position had been clearly stated in the Providence Journal immediately prior to that meeting.
MR. GOLDMAN: I object to the form. That's two questions. Could you ask one question.
Q. Does that clarify your recollection at all?
A. What are you asking me?
Q. I am asking you – let's do it this way.
MR. GOLDBERG: Could we mark that.
(Plaintiff's Exhibit 6 marked for ID.)
Q. You're certainly free to review the whole exhibit but I have just circled the point in red that I wish to draw your intention to, but should you wish to review the entire exhibit, please take your time and do so.
A. I guess -- what is the question?
Q. First, I'm asking you to review the portion I've indicated in red in that exhibit but also allowing you to look at the whole exhibit, if you wish to.
A. Okay.
Q. Now, the meeting that we've been discussing in the

Governor's office was October 28th, 2005; correct?
A. That is correct.
Q. I direct your attention to my last question.
A. Can you just rephrase it so I understand.
Q. Isn't it true that Mr. Tikoian indicated to the Governor that he was against the Champlin's proposal?
A. I don't believe that is true.
Q. Okay. Well, you were aware when you went into the meeting that Mr. Tikoian was totally disappointed with the vote of the subcommittee?
A. I read that in the paper as you did as well.
Q. No. You had read that in the paper prior to the meeting with the Governor?
A. Correct.
Q. And you were aware of that?
A. Yes.
Q. And so you read it in the paper on the Tuesday, October 25th, 2005 edition of the Providence Journal?
A. Yes.
Q. And you knew that before you read it in the paper, didn't you?
MR. GOLDMAN: Objection. I instruct him not to answer according to the deliberative



process privilege.
Q. Isn't it true that you participated in meetings where you showed members of the subcommittee prior to their workshop these plans that are in Plaintiff's Exhibit Number 5?
MR. GOLDMAN: Objection. Same objection. Instruct him not to answer.
Q. Now, you sat through the workshop, correct, the subcommittee workshop?
A. That is correct.
Q. Okay. And Mr. Lemont at that workshop supported the 100-foot plan shown on the diagram; is that correct?
A. The diagram was never part of the subcommittee workshop.
Q. Well, it was shown?
A. No, it was not.
Q. It was not shown?
A. No, it was not.
Q. But he did, in fact, support a 100-foot plan at the workshop?
A. That is what he stated, yes.
Q. Okay. He stated repeatedly; correct?
A. I would have to review the record.
Q. And is it just coincidental that you happened to



have at that workshop a 100-foot plan?
MR. GOLDMAN: I'm going to object on the deliberative process privilege as to why he prepared that. That's privileged.
Q. Why did you not show your 100-foot plan at the workshop?
A. Because, if you recall, you jumped up and down screaming that anything that we show would be -- that you would leave the workshop or something to that effect. So, to acquiesce to your concerns, we did not show anything.
Q. Okay. Because your recollection is I said I would leave the workshop if it was shown?
A. Or something to that effect, yes.
Q. Well, isn't it true, in fact, that other members of the subcommittee are the ones that said they would leave the workshop if it was shown and it wasn't me that said that at all? I have the transcript of the workshop, if you wish to review it.
A. I would have to review it to be able to answer directly.
Q. I have it right here. I have it right here for you.
MR. GOLDBERG: Just for purposes of the



record, I'm showing the witness the transcript of the Monday, October 24th, 2005 subcommittee workshop at East Providence City Hall.
MR. GOLDMAN: Are you going to direct him to a page?
THE WITNESS: If you want me to read the whole thing, I will.
MR. GOLDBERG: I would suggest to you that it is not in there. I never said that I would leave the workshop and I defy you to find it in there where I said that. I would suggest to you that it was other members of the subcommittee who, in fact, told you that. And I would suggest to you that your revelation in that regard is a further waiver of any claimed privilege.
MR. GOLDMAN: Mr. Goldberg, are you testifying today or are you asking --
MR. GOLDBERG: I'm asking the witness if that document refreshes his recollection or my comments in any way refresh his recollection as to who said they would leave the workshop. If you would like the area of the transcript where I did, in fact, jump up -- I don't recall jumping down -- but where I did, in fact, jump up, I would be happy to show it to you.

THE WITNESS: Would you like me to read this whole transcript? I will sit here and do it.

MR. GOLDBERG: It's up to you, whatever you want to do.

THE WITNESS: It's your show, sir.

MR. GOLDBERG: This is not a show. It's a very serious proceeding and you are placing yourself in great jeopardy in my humble opinion by giving evasive answers to my questions.

THE WITNESS: Mr. Goldberg, I'm trying to answer your questions as specifically as I can.

Q. What is your recollection at this time as to who said they would leave the workshop if you showed those plans?

A. I'm not quite sure whether it was you or one of the subcommittee members or several of the subcommittee members. I would have to review the document to be able to know that for sure.

Q. I would suggest to you that nowhere in the document is there such a comment from myself, nor is there one from the subcommittee members in that transcript.

A. Okay.

Q. But, if you would like to look and verify that, be my guest.



A. Okay.

Q. In fact, wasn't it a member Zarrella, Sahagian and Ricci who indicated -- members Zarrella, Sahagian and Ricci who indicated that they would leave the workshop if you showed that 100-foot plan?

A. I'm not 100 percent certain.

Q. Was it any of them?

A. I'm not sure. I'm not certain. I'm not 100 percent certain.

Q. What's your best recollection?

A. I've already given you my best recollection. I don't -- that is how I remember being told to limit the presentation to only the first three or four of these.

Q. And who told you that?

A. I believe it was Mr. Fugate.

Q. Mr. Fugate told you. And when did he do that?

A. At some point during the hearing or workshop, whatever you want to call it.

Q. So you said you only showed three or four of them?

A. Correct.

Q. Which three or four did you show at the workshop?

A. To the best of my recollection it would be numbers 1 through 5. However, I'm not certain that 4 and 5 were shown.



Q. At the subcommittee workshop?

A. At the subcommittee workshop.

Q. But 6, 7, 8 and 9 were certainly not shown at the workshop?

A. Certainly not because this was a subcommittee recommendation. It didn't exist at that point and the other alternative drawings were not shown.

Q. But they were, in fact, shown to the governor?

A. Yes.

Q. Okay. And they were, in fact, shown to Mr. Tikoian?

A. Yes.

Q. And this was prior to Mr. Tikoian's vote on the full committee -- strike that. This was prior to Mr. Tikoian's vote at the full council level. You showed these to the Governor and to Mr. Tikoian prior to Mr. Tikoian's vote at the full council level?

A. Correct.

Q. Okay. And did you have any further discussion of these plans with any members of the council between the subcommittee vote and the full council vote?

MR. GOLDMAN: Objection. Deliberative process. I instruct him not to answer.



MR. GOLDBERG: I would suggest that the question calls for a yes or no answer, which encompasses discussions beyond internal only and would include even under your reading, Mr. Goldman, non-privileged, i.e., if he discussed these plans with non-Coastal members or employees.

MR. GOLDMAN: I thought you said Coastal members.

MR. GOLDBERG: I said with anybody. Well, I'd like to clarify it with anybody.

MR. GOLDMAN: Well, I object to the extent that that would include Coastal members. I don't have a problem him answering the question of whether or not he discussed those plans with non-CRMC members.

MR. GOLDBERG: All right. Let me rephrase the question and just be eminently clear on this because it is so important to this case and to this witness personally.

Q. Did you discuss any of these plans that have been marked as Plaintiff's 5 with anybody after the subcommittee meeting? And anybody is a yes or no answer. I'm not asking you who at this stage.

MR. GOLDMAN: You can answer that.

THE WITNESS: Okay.

Page 62

A. But I just want to -- did I discuss anything in any of these plans with anybody after the subcommittee? Is that what you're -- I just want to be clear what you're asking me.
Q. Yes. Okay. Treat it that way.
A. So, did these come up at any time after that?
Q. Did you discuss them with anybody after the subcommittee meeting?
A. The entire plan package?
Q. Any of them. Any of them.
A. Yes.
Q. And we know already that you discussed them at the meeting with the Governor?
A. Yes.
Q. Okay. And did you discuss them with anybody, either staff or non-staff, at any time other than at the meeting with the Governor? And I am just looking for a yes or no answer.
A. I don't understand.
Q. Other than the meeting with the Governor, did you discuss these plans with anybody at any time since the subcommittee vote?
MR. GOLDMAN: I'm going to object. I'll let him answer but that is such a vague question.
MR. GOLDBERG: I'll narrow it down.

Page 63

MR. GOLDMAN: Why don't you narrow it down to --
MR. GOLDBERG: Let's get a start. If the answer is no, there's nowhere to go.
MR. GOLDMAN: Fair enough.
A. The answer is yes, as you know.
Q. Okay. And how many times did you have such discussions?
A. I'm not sure.
Q. More than one?
A. Yes, more than one.
Q. More than ten?
A. I'm not certain.
Q. Did you ever have any discussions with Coastal members about these plans with non-Coastal members present?
MR. GOLDMAN: And by non-Coastal members, do you mean --
MR. GOLDBERG: Non-Coastal council members or staff members.
A. I don't think so, no.
Q. Now, did you ever speak about this project with Mr. Adelman from the Governor's office?
A. Yes, he called and I e-mailed him these according to the e-mail.

Page 64

Q. You mailed him Plaintiff's 5?
A. Yes.
Q. When did you do that?
A. On October 25th.
Q. You e-mailed your PowerPoint presentation to Mr. Adelman?
A. Yes.
Q. Now, he called you on the telephone?
A. I think so, yes.
Q. And what did he say to you?
A. I think he was trying to get some background information prior to -- and my recollection is vague on this. I don't have any notes of the phone conversation but I believe he was trying to get some background information on Champlin's.
Q. And he called you direct?
A. I believe so, yes.
Q. Was that the first time you'd ever spoken to him?
A. I think so, yes.
Q. Okay. And had you ever met him at any occasion before that?
A. I believe I met him on the dredge tour. He may have been there.
Q. Did he ask you any questions about Champlin's on the dredge tour?

Page 65

A. No, he did not.
Q. Okay. And the dredge tour, once again, was when?
A. I don't recall.
Q. Back in '04?
A. I'm not sure.
Q. Well, it was prior to the date on Plaintiff's 2, which is 11/9/04; correct?
A. I would assume so, yes. I honestly don't recall. I gave literally, you know, hundreds of tours, about 100 tours on that dredge. So, the specific ones, I don't recall.
Q. But Mr. Adelman was on one of them?
A. I believe he was with the Governor.
Q. Okay. On the one time?
A. On the one time the Governor was there, yes.
Q. And I assume he started the conversation -- Mr. Adelman from the Governor's office.
A. I'm sorry?
Q. I assume he started his conversation with you on the telephone, Mr. Adelman, from the Governor's office; is that correct?
A. I don't recall but I would assume so, yes.
Q. Did you recognize his voice on the phone?
A. No.
Q. Okay. And specifically what did he say to you on

that call?
A. I don't recall specifically.
Q. Generally, did he tell you he was trying to gather information on Champlin's?
A. I think that was the call, yes. I don't recall the specifics of it.
Q. Okay. But can we agree that the Governor's tour of the dredging project was before this letter from Mr. Tikoian in Plaintiff's 3 where he is recounting it in the past tense.
A. I would presume so, yes.
MR. GOLDMAN: That's 3 and 4?
MR. GOLDBERG: Yes.
A. Yes. It would seem obvious, yes.
Q. Okay. So you knew him from then back in '04?
A. I met him one time. There was a substantial number of people on all of these tours.
Q. Okay. And then you heard from him again on Tuesday, October 25th, '05?
A. Yes.
Q. Okay. And that was the same date that Tikoian's comment had been in the paper?
A. Yes.
Q. Okay. And just coincidentally on that day Mr. Adelman called you about the Champlin's project;



correct?
A. I'm assuming it's not a coincidence but he did call that day.
Q. Okay. And did he and you discuss the newspaper article at all?
A. I don't recall.
Q. One way or the other?
A. I don't recall.
Q. Okay. And did he and you discuss Mr. Tikoian's reported opposition to the project?
A. I don't recall.
Q. Did he and you discuss Mr. Abedon's reported opposition to the project?
A. I don't recall.
Q. Did you ever discuss this issue with Mr. Abedon?
MR. GOLDMAN: Objection. Deliberative process privilege.
Q. Did you in any form ever show these plans in Plaintiff's 5 to Mr. Abedon?
MR. GOLDMAN: Objection. Same objection.
Q. I believe that calls for a yes or no. It could have been in public, it could have been with other people present?
MR. GOLDMAN: If it was part of the discussion that Mr. Goulet may or may not have had



with Mr. Abedon during the deliberative process, I object to it and instruct him not to answer.
Q. Well, did you at any time, it's not just during the deliberative process, discuss these plans with Mr. Abedon?
MR. GOLDMAN: Again, I'm objecting to it.
MR. GOLDBERG: Are you instructing him not to answer?
MR. GOLDMAN: I am instructing him not to answer.
Q. Did you ever discuss this newspaper article, Plaintiff's 6, with Mr. Abedon or Mr. Tikoian?
A. No.
Q. Did you ever discuss their position on the Champlin's project with them at any time, either before or after the full council vote?
MR. GOLDMAN: I'm going to object to the form of that question and to the extent it calls for anything prior to the vote, I'm going to instruct him not to answer. So, if it was after the decision, you can answer it. If it was prior to the decision, do not answer it.
THE WITNESS: Can you please read back the question?
MR. GOLDBERG: I'll rephrase the



questions.
Q. Since the full council vote on February 28th, '06, have you discussed the Champlin's proposal with either Mr. Abedon or Mr. Tikoian?
A. No.
Q. Now, who did you discuss your attendance at today's deposition with?
A. I guess -- who did I inform that I was subpoenaed, is that what you're asking me?
Q. That's part of it.
A. I informed my direct supervisor, Mr. Fugate and I informed -- or Mr. Fugate informed Mr. Goldman.
Q. Okay. Did you discuss this testimony, this upcoming testimony, with Mr. Tikoian?
A. No, I did not.
Q. Did you discuss it with any council members?
A. No, I did not.
Q. On any other staff members?
A. Did I discuss my testimony or the fact that I have to testify?
Q. The fact that you have to testify.
A. Only with Mr. Fugate.
Q. Okay. And what did he say about it?
A. Excuse me, Mr. Willis, who is also the deputy

director, he knows that I must testify as well.
Q. Now, Mr. Adelman called you on the 25th and said what?
A. I don't recall specifically.
Q. The end result was you sent him the plans?
A. That is correct.
Q. Do you have any idea how Mr. Adelman knew on the 25th that you had drawn alternative plans?
A. I presume that in his discussions with either Mr. Fugate or others that he must have been aware.
Q. Now, there was another representative from the Governor's office at the subcommittee hearing; is that correct?
A. It was a room full of people. I presume there was somebody from the Governor's office but I don't recall who it may have been.
Q. Why do you presume that there was?
A. You justify said there was.
Q. I'm sorry?
A. You just said that there was.
Q. Did you have any contact with the Governor's office concerning this project prior to the subcommittee meeting?
A. I'm sorry?
Q. Did you have any contact with the Governor's



office concerning this meeting, the Champlin's project, prior to the subcommittee meeting?
A. I don't think so. Not that I -- no, I don't think so.
Q. Do you know Mr. David Trembly from the Governor's office?
A. No. The name is not familiar.
Q. So, you don't know whether or not he sat with Mr. Tikoian at the subcommittee meeting?
A. No.
Q. Now, do you know why Mr. Tikoian's name plate and a place was reserved for him at the council table at the subcommittee meeting?
A. No.
Q. I just want to be clear. Were these part of your exhibit?
A. I wanted to -- these were -- we had the blue numbers.
Q. Yeah.
A. These correspond to the -- the 1 corresponds to the 1. The 2 corresponds to the 2 because there was an attachment. So, I just wanted to -- you to have the attachments. I just wanted to make sure --
MR. GOLDMAN: That was in response to



Number 2, which is the correspondence with anybody else regarding the Champlin's --
THE WITNESS: It's an e-mail. So I wanted to be --
MR. GOLDBERG: For purposes of the record, I thought we had marked as Plaintiff's Exhibit 5 everything that you had brought in response to the subpoena. Apparently, I was mistaken, and you have now clarified that for me that there are 1, 2, 3, 4, 5 e-mails that you also brought in response to the subpoena; is that correct?
THE WITNESS: Correct, yes.
Q. And the 1 in the -- or the number in the other corner of Plaintiff's 5 corresponds to these various e-mails?
A. Yes. I thought we had already done that once but, yes, that is correct.
Q. Okay.
MR. GOLDBERG: Then I would ask that we mark these e-mails as the next -- collectively as the next exhibit. The e-mails are all part of 5.
THE WITNESS: I thought this was together.
MR. GOLDBERG: Then they are all part of 5.
MR. GOLDMAN: Then 5 will have fourteen



pages to it rather than nine.
MR. GOLDBERG: It's now five minutes of 4:00. We've been going for approximately a couple of hours. It's abundantly clear that Mr. Goldman and myself cannot work out our differences as to our interpretation of the law here this afternoon, and that we're going to have to file motions on behalf of our respective positions and then reconvene this deposition in any event. So, if I do have the agreement of the parties -- with the agreement of the parties, we will suspend the deposition at this time for today and file our motions and then reconvene. I would indicate, however, that I do have many more areas to go into that may or may not prompt Mr. Goldman to wake up and object. So, with that said --
MR. GOLDMAN: I assure you, Mr. Goldberg, I'm awake.
MR. GOLDBERG: This would be continued with the subpoena in full force and effect to hopefully a mutually convenient date.
MR. GOLDMAN: I have no objection to that.
MS. RICHARDS: No objection.
MR. GOLDBERG: Okay. That would conclude today. I would just also ask if we can run out

and copy these right now.

MR. GOLDMAN: I'll take a copy.

MS. RICHARDS: I'll take a copy.

MR. GOLDMAN: Can we just go back on the record. I want to reserve our right to review the deposition before it's certified. Under the federal rules, we have a right to review it to make sure that it's accurate. So, I just want to reserve that right. I'll work that out with you but I just want to put on the record that I reserve that right.

MR. GOLDBERG: Well, I'm not certain that you have that right but I understand you're not waiving any rights. The federal rules provide for it. I think it's not the agency's, it's the witness's rights and I think there are --

MR. GOLDMAN: I'm doing it on behalf of the witness.

MR. GOLDBERG: I think there are a lot of issues here that the witness may want to consult his own counsel. Having said that, you're not waiving that right?

MR. GOLDMAN: He's badgering you.

(Deposition concluded at 4:07 p.m.)

C-E-R-T-I-F-I-C-A-T-E

I, SALLY BRASSARD, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of DANNI GOULET, the witness in the above-entitled cause, was taken before me on behalf of the Plaintiff at Goldberg Law Offices, 226 Cottage Street, Providence, Rhode Island, on July 12th, 2006, at 2:00 P.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Plaintiff's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF I have hereunto set my hand this 20th day of July, 2006.

Sally Brassard RPR/CSR, Notary Public

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)